UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BONA FIDE CONGLOMERATE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SOURCEAMERCA; PRIDE INDUSTRIES, INC.; KENT, CAMPA & KATE, INC.; SERVICESOURCE, INC.; JOB OPTIONS, INC.; GOODWILL INDUSTRIES OF SOUTHERN CALIFORNIA; LAKEVIEW CENTER, INC.; THE GINN GROUP, INC.; CORPORATE SOURCE, INC.; CW RESOURCES; NATIONAL COUNCIL OF SOURCEAMERICA EMPLOYERS; and OPPORTUNITY VILLAGE, INC.,<br><br>Defendants. | Case No.:  3:14-cv-00751-GPC-AGS<br><br>**ORDER**<br><br>**(1) GRANTING IN PART AND DENYING IN PART BONA FIDE'S MOTION TO EXCLUDE THE TESTIMONY OF MARY KAREN WILLS [ECF No. 561];**<br><br>**(2) GRANTING IN PART AND DENYING IN PART SOURCEAMERICA'S MOTION TO EXCLUDE THE TESTIMONY OF KEVIN M. JANS [ECF No. 521];**<br><br>**(3) GRANTING IN PART AND DENYING IN PART SOURCEAMERICA's MOTION TO STRIKE DECLARATIONS OF KEVIN M. JANS [ECF No. 575].** |

SOURCEAMERICA,

Counterclaimant,

v.

BONA FIDE CONGLOMERATE, INC.;
and RUBEN LOPEZ,

Counterdefendants.

Pending before the Court are three motions pertaining to expert testimony.  On July 13, 2018, Defendant SourceAmerica filed a motion to exclude the expert testimony of Kevin M. Jans (ECF No. 521). This motion has been fully briefed.  (ECF Nos. 546, 572.)  On August 6, 2018, Plaintiff Bona Fide filed its motion to exclude the expert testimony of Mary Karen Wills, (ECF No. 561), which has similarly received the benefit of full briefing.  (ECF Nos. 550, 573.)  Thereafter, SourceAmerica moved to strike two nearly-identical declarations by Mr. Jans (ECF No. 575); the declarations at issue had been submitted by Bona Fide in opposition to SourceAmerica's motion for summary judgment and to SourceAmerica's motion to exclude Mr. Jans's testimony.  BonaFide submitted a response to the motion to strike (ECF No. 585); SourceAmerica filed no reply.

Having considered the applicable law and the parties' arguments, the Court holds as follows: Bona Fide's motion to exclude the testimony of Mary Karen Wills is **granted in part** and **denied in part** (ECF No. 561).  SourceAmerica's motion to exclude the testimony of Kevin M. Jans is **granted in part** and **denied in part** (ECF No. 521). SourceAmerica's motion to strike portions of Mr. Jans's declarations is also **granted in part** and **denied in part** (ECF No. 575).[1]

## I.     BACKGROUND

The AbilityOne Program is a public-private procurement system designed to fulfill

---

[1]     The Court considered all of the arguments presented in all the foregoing motions, even those not discussed in this Order.  To the extent that arguments are not acknowledged in this Order, they are rejected.

the objectives of the Javits-Wagner-O-Day ("JWOD") Act, 41 U.S.C. § 8501 *et seq.*, by requiring federal agencies to purchase select products and services from Non-Profit Agencies ("NPA"s) that provide employment and training opportunities for persons who are blind or have severe disabilities.  41 C.F.R. § 51-1.1.  The AbilityOne Program is administered by the AbilityOne Commission ("AbilityOne Commission"), which in turn has designated SourceAmerica as a Central Nonprofit Agency ("CNA") responsible for helping it carry out its mission under the JWOD Act.

As a CNA, SourceAmerica helps to recommend and design service contracts, named "Opportunities," for participating NPAs to bid on.  In this capacity, SourceAmerica "functions as a technical evaluation panel and makes recommendations to the Commission on the qualifications and abilities of prospective nonprofit agencies to perform the work."  *Nat'l Telecommuting Inst., Inc. v. United States*, 123 Fed. Cl. 595, 598 (2015).  First, SourceAmerica communicates with the procuring government agency, i.e., the federal customer, about its need for a particular service, whether it is for grounds maintenance, or IT, or childcare.  Then, based on those inputs, SourceAmerica crafts Opportunity Notices, or Sources Sought Notices ("SSNs"), which communicate to NPAs the particular scope and requirements of the service sought.  Sometimes those Notices include mandatory requirements, such as certain levels of security clearance, or prior work history in the specific service industry.  Sometimes, they will express preferences for NPAs with geographic experience, or other such criteria.  After collecting responses from interested NPAs, SourceAmerica assesses the NPAs' proposals for their ability to perform the service requested, and based off of its appraisal, selects one NPA to recommend to the AbilityOne Commission for approval.  With rare exceptions, the AbilityOne Commission will accept SourceAmerica's recommendation as the contractor. The entirety of this process has been interchangeably referred to by the parties as the source-selection process, the acquisitions process, the NPA recommendation process, among other things.

Bona Fide is an NPA that received a number of AbilityOne projects in the mid to

late 2000's.  However, as a result of two bid protests not at issue here, Bona Fide's relationship with SourceAmerica soured in the ensuing years.  In 2012, the parties signed a Settlement Agreement (the "Settlement Agreement") resolving their bid protest disputes.  The Settlement Agreement obligated SourceAmerica to "use best efforts to provide that Bona Fide is treated objectively, fairly, and equitably in its dealings with [SourceAmerica], with specific attention to contract allocation." (ECF No. 519-4, at 7.)

Significantly, since the execution of the Settlement Agreement, Bona Fide has received no recommendations for contracts from SourceAmerica.  In response, Bona Fide filed a complaint that SourceAmerica breached its obligations under the Settlement Agreement, alleging, *inter alia*, that SourceAmerica's source-selection process was plagued by conflicts of interests and biases against Bona Fide.  SourceAmerica denied those allegations and moved for summary judgment on Bona Fide's summary judgment claims.

As relevant to the motions at hand, SourceAmerica and Bona Fide have proffered two dueling expert witnesses—Ms. Wills, and Mr. Jans, respectively—to support their theories of the case.  Both sides have moved to exclude each other's witnesses.

## II.  LEGAL STANDARD

The trial judge must act as the gatekeeper for expert testimony by carefully applying Federal Rule of Evidence 702 to ensure specialized evidence is "not only relevant, but reliable."  *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589 & n.7 (1993) ("*Daubert I*").  The Court's obligation "to scrutinize carefully the reasoning and methodology underlying [expert] affidavits" applies even on summary judgment.  *Houle v. Jubilee Fisheries, Inc.*, No. C04-2346JLR, 2006 WL 27204, at *5 (W.D. Wash. Jan. 5, 2006) (quoting *Daubert I,* 509 U.S. at 501)).  An expert witness may testify

> if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has reliably applied the principles and methods reliably to the facts of the case.

4

Fed. R. Evid. 702. The proponent of the evidence bears the burden of proving the expert's testimony satisfies Rule 702. *Cooper v. Brown*, 510 F.3d 870, 880 (9th Cir. 2007).

The Court has broad discretion in exercising its gatekeeping function, *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000), which applies to both scientific and non-scientific testimony. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying *Daubert* to all expert testimony, not just scientific testimony); *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004). Under Rule 702, the Court must assure itself of two things: that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert I*, 509 U.S. at 589.

Where, as here, experts are retained to offer non-scientific testimony, the reliability inquiry will "depend[] heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004) (quoting *Hankey*, 203 F.3d at 1169)). It is generally said that "[d]isputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, at 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

The second prong, relevance, focuses on whether the expert testimony "fits" the facts of the trial. That is, the testimony must be "relevant to the task at hand" in that it "logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms. Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). At bottom, the dispositive question for the relevance prong is whether the proposed testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert I*, 509 U.S. at 591; *Elsayed Mukhtar v. Cal. State. Univ., Hayward*, 299 F.3d 1053, 1063

n.7 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003) ("Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the 'central concern' of Rule 702.").

To the extent that an expert purports to offer a legal opinion on an ultimate issue, such testimony must be excluded because "offering legal conclusion testimony invades the province of the trial judge." *Nationwide v. Kass Info. Sys., Inc.*, 523 F.3d 1051, 1059 (9th Cir. 2008); *Mukhtar*, 299 F.3d at 1066 n.10 ("[A]n expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law."). In breach of contract cases, the expert may not be allowed to opine on the meaning and import of disputed terms. *See PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 291 F. App'x. 40, 41 (9th Cir. 2008) (unpublished) ("The expert testimony proffered by AISLIC went to the interpretation of the underlying settlement agreement, a contract, an ultimate question of law upon which the opinion of an expert may not be given."). To permit any such testimony would be to commit error, as it is well-known that matters of law are generally "inappropriate subjects for expert testimony." *Aguilar v. Int'l Longshoremen's Union Local No. 10*, 966 F.2d 443, 447 (9th Cir. 1992).

As a corollary of this principle, expert conclusions which do not inform the jury about the facts but which "merely function like jury instructions," are impermissible. *Lee v. First Nat'l Ins. Co.*, No. CV0906264MMMCWX, 2010 WL 11549637, at *10 n.80 (C.D. Cal. Dec. 22, 2010) (quoting Charles A. Wright et al., FED. PRAC. & PROC. EVID. § 6265.2 (2d ed.)); *accord Nationwide*, 523 F.3d at 1060. On one level, they are improper because they invade the province of the court to instruct the jury as to the law. *United States v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) ("Resolving doubtful questions of law is the distinct and exclusive province of the trial judge." (internal quotation marks omitted)). And on another, they do not "help" the jury within the meaning of Rule 702, as they "do nothing more for the jury than tell it what verdict to reach." *Lee*, 2010 WL 11549637, at *10.

### III. Motion to Exclude Kevin M. Jans's Expert Testimony

On May 9, 2017, Bona Fide designated Mr. Jans as an expert who may testify on: "(a) the likelihood that Bona Fide would have been awarded each of the opportunities alleged in Bona Fide's First Amended Complaint and Supplemental Complaint, but for SourceAmerica's breach of the July 2012 Settlement Agreement;" ("Opinion A"); "(b) how the AbilityOne program functions;" ("Opinion B") and "(c) how SourceAmerica abused its role in the AbilityOne program to Bona Fide's detriment" ("Opinion C"). (ECF No. 521-4, at 2 (Sealed).)

SourceAmerica seeks to exclude Mr. Jans's testimony as to each of the three above opinions (ECF No. 521). For the reasons articulated below, the Court will deny SourceAmerica's motion to exclude Mr. Jans' testimony as to Opinions B and C and grant it in part with respect to Opinion A.

**A. Jans's Opinions on How the AbilityOne Program Functions (Opinion B), and How SourceAmerica Abused its Role in the AbilityOne Program to Bona Fide's Detriment (Opinion C)**

Mr. Jans dedicates the first substantive section of his expert report to describing his understanding of how the AbilityOne Program functions. (ECF No. 535-10 (Sealed).)

Mr. Jans begins by articulating the "traditional" government procurement process in terms of the "Acquisition Time Zones," a conceptual framework he devised. (*Id.* at 17–21.) The Acquisition Time Zones charts out the four stages of the government buying process, whereby the government first defines its needs, conducts market research to see capabilities of potential contractors who might fulfill those needs, requests proposals, and ultimately evaluates and selects from proposals submitted by offerors.

Next, Mr. Jans juxtaposes the traditional procurement process with that conducted by SourceAmerica under Ability One. (*Id.* at 22–31.) According to Mr. Jans, there are a few critical factors distinguishing the two. The first lies in SourceAmerica's relative autonomy, from both AbilityOne Commission oversight and from Federal Acquisitions Regulation ("FAR") principles requiring full and open competition in the government's solicitation of contracts. (*Id.* at 22 (citing FAR. 6.302-5(b)(2) (exempting the AbilityOne

3:14-cv-00751-GPC-AGS

Program from the dictates of FAR 6.101, which prescribes "full and open competition"))). The second major difference adheres in Mr. Jans's assessment that, although the AbilityOne Commission technically has final say in accepting or rejecting any NPA recommendations propounded by SourceAmerica, SourceAmerica is the de facto deciding entity. (*Id.* at 26.) In Mr. Jans's experience with federal government contracting, it is "exceedingly rare for the buying authority [in this case, the AbilityOne Commission] to NOT take the recommendation of the evaluation team." (*Id.*)

Mr. Jans recognized that the special features of SourceAmerica's acquisitions process were designed to serve the AbilityOne Program's goal of creating more jobs for the blind and severely handicapped. (*Id.* at 33.) Dispensing with competitive bidding procedures and having relative autonomy to structure each step of the buying process would enable the AbilityOne Program to discharge its mission.

At the same time, the confluence of these unique factors makes SourceAmerica's administration of the AbilityOne Program especially vulnerable to abuse and manipulation at every stage of the acquisitions process. Mr. Jans opines that SourceAmerica's "wide latitude to structure the acquisition process . . . [down to] how the evaluation criteria in [each Opportunity Notice] are structured, the evaluation of proposals from the NPAs, and the 'recommendation' of the NPA," (*id.* at 32), lends itself to easy exploitation by those with conflicts of interest. (*Id.* at 38.) Those conflicts, he asserts, come in three flavors: contracts awarded "1) to [SourceAmerica] itself, 2) to non-profit NPAs owned by its members of its Board of Directors, and even 3) to NPAs who hire SourceAmerica employees after a contract is distributed to them." (*Id.* at 42.) Concomitant with this vulnerability to conflicts of interest, and perhaps, as a result of it, is SourceAmerica's preference for large NPAs. Mr. Jans's assessment is that SourceAmerica promotes the interest of a group of favored, larger NPAs, to whom it awards contracts, and who, as a result of those contracts, become more sophisticated and increasingly eligible to take on more and more complex (and lucrative) contracts. (*Id.* at 39–41.)

According to Mr. Jans, SourceAmerica makes decisions at key points in the acquisition process to favor, or disfavor certain NPAs. For example, SourceAmerica is alleged to have quietly "structur[ed bidding] requirements to exclude small NPAs, including Bona Fide." (*Id.* at 32.) Exclusionary practices manifest in a number of ways. Sometimes, SourceAmerica would elect to bundle multiple service requests together under one larger Opportunity rather than segregate them out into smaller, separate Opportunities more likely to be won by smaller NPAs. Other times, SourceAmerica would require NPAs to have expensive certifications not required or mandated by the federal customer. Other times yet, SourceAmerica is accused to have made ex post facto changes to contract requirements after Sources Sought Notices had already been issued to the public, changes which benefited a favored NPA over another.

SourceAmerica challenges the above testimony on only one ground: Mr. Jans's lack of qualifications to opine specifically on the AbilityOne Program. (*See* 521-1, at 14–16.) SourceAmerica asserts that Mr. Jans had no experience with the AbilityOne Program prior to his retention as an expert, and that he had spent an inadequate amount of time (20 to 30 hours) familiarizing himself with the particularities thereof. (*Id.* at 15.)

The Court cannot agree that Mr. Jans's opinions are made without "knowledge, skill, experience, training, or education," as SourceAmerica alleges. *Jinro Am., Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Mr. Jans has worked in the field of government contracting for 22 years, and spent 15 of those years at the Department of Defense in various roles including Contract Specialist, Contracting Officer, and Procurement Analyst. (ECF No. 558-28, at 2–4.) In those positions, Mr. Jans supported, managed, led, reviewed, and advised on high dollar-value government contracts relating to a wide variety of goods and services, including those attached to base operations, facilities management, software development, logistics, and more. (*Id.* at 5–6.) Mr. Jans's work at the DoD required him to develop acquisition strategies and management processes, to operate pursuant to the applicable federal regulations and rules, and, at one point, to contribute to drafting a section of the FAR pertaining to conflicts of interest.

(*Id.* at 12–13.)  While at the DoD, Mr. Jans earned a Masters of Arts degree in Human Resources Development from Webster University, in addition to other credentials from various contract management training programs.  (*Id.* at 23–26, 27–29.)  Mr. Jans's knowledge, skill, experience, training, and education in the general field of federal government acquisitions is demonstrable.

Moreover, that Mr. Jans had no previous experience with the AbilityOne Program does not detract from his qualifications to testify to how the program functions. SourceAmerica relies on *George v. Morgan Const. Co.*, 389 F. Supp. 253, 259 (E.D. Pa. 1975), to argue that Mr. Jans must "show special knowledge of the very question upon which he is to express an opinion," knowledge which it contends Mr. Jans does not possess with respect to the AbilityOne Program.  However, Rule 702 "contemplates a broad conception of expert qualifications."  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).  In that regard, so long as the expert's testimony remains "within the reasonable confines of his subject area," it is admissible.  *Avila v. Willits Envt'l. Remediation Trust*, 633 F.3d 828, 839 (9th Cir. 2011) (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969–70 (10th Cir. 2001).  A lack of specialization as to the AbilityOne acquisitions process goes to the weight of Mr. Jans's testimony, not to its admissibility.  *See Karmelich v. Transportacion Maritima Mexicana S.A. de C.V.*, 114 F.3d 1194, 1997 WL 289476, at *1 (Table) (9th Cir. 1997) (holding expert's general knowledge of cargo vessel design qualified him to testify to the standard of care for longshoremen working on deck because "any lack of particularized expertise would go only to the weight of his testimony") (citing *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993)).

Nor does *Dickman v. Alvarado Hosp. Med. Ctr., Inc.*, a case offered by Source America, persuade the Court otherwise.  No. 02CV2371-BEN (WMc), 2006 U.S. Dist. LEXIS 83626 (S.D. Cal. Nov. 14, 2006).  There, the district court precluded an expert with plastic surgery expertise from offering testimony on the subject of urology.  Its rationale was two-fold: first, the court noted that the expert had been the subject of

twenty-six malpractice actions and had his medical license revoked for gross negligence. *Id.* at 11. Second, the court held that "specialized knowledge on training on some other issue," i.e., as to sex change operations and plastic surgery, "did not render him an expert on the issues before the Court." *Id.* at 12.

*Dickman* is entirely inapposite to the case at hand: the distance between federal acquisitions under FAR and federal acquisitions under AbilityOne is hardly comparable to the distance between cosmetology and urology. Here, Mr. Jans relied on his qualifications in the field of government acquisitions under FAR to deliver testimony on a closely-related matter—acquisitions under AbilityOne. Moreover, he researched AbilityOne by perusing both publicly-available materials and documents made available during the course of this litigation, consulting "a former contracting officer" with experience as to AbilityOne, and reviewing statements made by Ms. Jean Robinson, SourceAmerica's then-General Counsel, about how SourceAmerica conducts its source-selection process. (ECF No. 535-10, at 15–16.) Although it is a fair question whether 20 to 30 hours dedicated to studying AbilityOne is sufficient, the answer to that question goes to weight, not admissibility.

SourceAmerica's challenge as to Mr. Jans's qualifications are unavailing. Accordingly, the Court will deny its motion to exclude Mr. Jans's testimony as to the AbilityOne Program (Opinion B), and how SourceAmerica utilized its role in AbilityOne (Opinion C).

**B. Opinion on the likelihood that Bona Fide would have been awarded each of the opportunities alleged in Bona Fide's First Amended Complaint and Supplemental Complaint (Opinion A)**

The remainder of Mr. Jans's expert report focuses on the relationship between SourceAmerica's conduct and the harm alleged by Bona Fide (Opinion A). Mr. Jans states that SourceAmerica "did not provide that Bona Fide was treated objectively, fairly and/or equitably in the allocation of the contracts reviewed for this report, as promised in the 2012 Settlement Agreement," and that, "but for SourceAmerica's [inequitable

actions], it was reasonably probable that Bona Fide would have been allocated the contract [sic] resulting from the [Opportunity Notices discussed] in this report." (ECF No. 535-10, at 47.)

At issue is the latter half of Mr. Jans's opinion which pertains to causation. SourceAmerica objects that Mr. Jans's ultimate conclusion—that Bona Fide was reasonably likely to have won the contested contracts, "but for" SourceAmerica's unfair and inequitable conduct—is the product of faulty and unreliable methodology. (*See* ECF No. 521-1, at 17.)

Specifically, SourceAmerica faults Mr. Jans for not performing "a comparative analysis of the NPA responses submitted to SourceAmerica." (ECF No. 521-1, at 17.) SourceAmerica's position is that Mr. Jans cannot possibly claim that Bona Fide was reasonably likely to have prevailed on its bids if he did not juxtapose Bona Fide's qualifications against those of the other NPAs that also submitted bids. SourceAmerica points out that there were anywhere between three to nine other NPA proposals submitted for each Opportunity at issue. Without a comparative analysis of the relative capabilities of the competing NPAs, "it is pure speculation for [Mr. Jans] to conclude that Bona Fide was reasonably certain to have obtained any of the Opportunities at issue, much less <u>all</u> of the Opportunities." (*Id.*)

Under controlling caselaw, the Court need not admit an expert opinion that is connected to the underlying data "only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It is, in fact, incumbent on the Court to exclude such testimony if it determines that "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also Daubert II*, 43 F.3d at 1319 ("The trial court's gate-keeping function requires more than simply taking the expert's word for it.").

Here, the Court finds that there is no analysis or factual data contained in Mr. Jans's proffered testimony to support his conclusion that "it was reasonably probable" that Bona Fide would have prevailed on all of the disputed Opportunity Notices. Despite his designation as an expert on causation, the vast majority of Mr. Jans's assessment is

geared toward the issue of breach—i.e., were there ways in which SourceAmerica acted unfairly in structuring and administering AbilityOne Opportunities with respect to Bona Fide. In contrast, there is no discussion as to how those breaches relate to Bona Fide's loss of contracts besides Mr. Jans's ipse dixit.

To be admissible, Mr. Jans's but-for causation conclusion has to have some factual support. Whether or not Mr. Jans conducted the comparative analysis urged by SourceAmerica, he should have—at a minimum—analyzed whether Bona Fide satisfied the *legitimate* Opportunity requirements which were not tainted by SourceAmerica's unfairly-added assessment criteria. To wit, he could have attempted to identify which certification requirements were borne out of conflicts of interest, and to demonstrate that, with those improper requirements removed, that Bona Fide was reasonably likely to prevail because it met all of the other applicable Opportunity specifications. And with respect to those Opportunities for which SourceAmerica stands accused of improperly bundling together, Mr. Jans might have attempted to show Bona Fide's capacity to satisfy all the requirements applicable to one of the smaller, partial contracts.

Mr. Jans's analysis, however, does none of these things; instead, it focuses exclusively on the wrongs perpetrated by SourceAmerica. But simply pointing out SourceAmerica's wrongful actions—i.e., its *breaches*—does not furnish any factual basis for Mr. Jans's conclusion that Bona Fide was otherwise qualified or likely to win the disputed contracts as a matter of *causation*. Put differently: without evaluating Bona Fide's affirmative qualifications or pointing to any facts indicating Bona Fide's compliance with legitimate assessment criteria, how can Mr. Jans conclude that it was "reasonably probable" that Bona Fide would have prevailed on any of the disputed Opportunities, much less all of them?

By leaving the gatekeeper to guess how his conclusions are derived from any of the data before him, Mr. Jans's proffered testimony falls woefully short of the Rule 702 threshold. *See, e.g.*, *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1032 (C.D. Cal. 2018) (excluding an expert opinion because "[p]laintiffs do not explain how

[their expert's] 'observation' is in any way derived from his survey and there is no such connection apparent to the Court"). This conclusion shall be excluded.

## IV. SourceAmerica's motion to strike Mr. Jans's Declarations

SourceAmerica has also moved to strike portions of two declarations by Mr. Jans. (ECF No. 575). The declarations in question were submitted in support of Bona Fide's opposition to SourceAmerica's summary judgment motion (ECF No. 551-1 "MSJ Declaration")) and Bona Fide's opposition to SourceAmerica's motion to exclude Mr. Jan's testimony. (ECF No. 546-1 "Expert Testimony Declaration")). The declarations are largely identical and run approximately 37 pages. SourceAmerica argues that Mr. Jans's declarations were untimely, improper supplementations under Rule 26(e) that should be stricken pursuant to Rule 37. It further contends that Mr. Jans impermissibly attempts to offer an interpretation of the Settlement Agreement.

### 1. Legal Standard

Federal Rule of Civil Procedure Rule 26(e) allows parties to supplement an initial expert disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1).

However, to be proper, Rule 26(e) supplementations must be limited in scope. "Rule 26(e) creates a 'duty to supplement,' not a right," *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500 (9th Cir. 2009), and does not permit the "parties to add information that should have been provided in the initial disclosure." *Arizona Oil Holdings LLC v. BP W. Coast Prod. LLC,* No. CV-14-00569-PHX-GMS, 2015 WL 13567347, at *1–2 (D. Ariz. May 29, 2015). For example, courts have rejected supplemental expert reports that: (1) "were significantly different" from the expert's original report and effectively altered the expert's theories; or (2) attempted to "deepen" and "strengthen" the expert's prior reports. *Copper Sands Homeowners Ass'n v. Copper Sands Realty, LLC*, 2013 WL 2460349, at *2 (D. Nev. June 5, 2013). Courts must be

vigilant that Rule 26(e) does not "create a loophole through which a party who submits partial expert witness disclosures can add to them to its advantage after the court's deadline for doing so has passed." *Munchkin, Inc. v. Playtex Prod., LLC*, 600 F. App'x 537, 538 (9th Cir. 2015), as amended (July 31, 2015); *see also Luke*, 323 F. App'x at 500.

### 2. Analysis

SourceAmerica's challenge to Mr. Jans's declarations fall into three categories. The Court will address them in turn.

### a. Expansion on the Acquisition Time Zones

SourceAmerica seeks to strike Mr. Jans's explanation of how his theory of the Acquisition Time Zones applies to this case. The sections at issue are located at Paragraphs 48–74 of the MSJ Declaration, and Paragraphs 48–76 of the Expert Testimony Report.

As explained *supra*, the Acquisition Time Zones are a four-part schematic Mr. Jans devised to explain the typical stages of government acquisitions. Mr. Jans relies on the Acquisition Time Zones in his declarations to rebut SourceAmerica's critique of his failure to conduct a comparative analysis of NPA responses and how they fulfilled the stated Opportunity criteria.

In his declarations, Mr. Jans explains how SourceAmerica's tight control over acquisition strategy and Opportunity design in Zones 1 and 2 (which refer to ascertaining client requirements, contract formulation, and establishing selection criteria, labeled the "Requirement Zone" and "Market Research Zone," respectively), allowed it to promulgate Opportunity Notices containing unfair or inappropriate evaluative criteria in Zone 3 ("Request for Proposal Zone"), which in turn enabled it to assign Opportunities to whichever NPA it chose in Zone 4 ("Source Selection Zone"). According to Mr. Jans, given SourceAmerica's control over the early Acquisition Time Zones, it would not make sense for Mr. Jans to perform a comparative analysis, since any source-selection criteria used to assign the Opportunity in Zone 4 would have been structured and manipulated by SourceAmerica in the earlier zones to favor certain NPAs over others. "Looking only at

Zone 4," (i.e., the ultimate selection of an NPA based on an evaluation of its ability to meet the Opportunity specifications) "actually obscures the fact that the evaluation reports are in large part a *result* of what Source America did or did not do in zones 1, 2, and 3." (ECF No. 558-28, at 34 (Sealed)). "Such a narrow approach ignores all the decisions in the other three zones." (*Id.* at 35.)

SourceAmerica seeks to strike this aspect of Mr. Jans's declarations as an untimely attempt to register additional opinions past the Court's deadline for expert disclosures. SourceAmerica contends that the Acquisition Time Zones were but a marginal part of Mr. Jans's expert report, and that the marquee role they took in Mr. Jans's declarations transformed his opinion to a wholly new opinion. SourceAmerica contends that Mr. Jans devoted no more than two pages of his expert report to the Acquisition Time Zones, and now, they are "suddenly front and center as his unifying theory" in the declarations. (ECF No. 575, at 10.)

In response, Bona Fide argues that Mr. Jans's reliance on the Acquisition Time Zones framework is replete throughout Mr. Jans's original report and that his declarations were offered in response to SourceAmerica's criticism of his methodology. (ECF No. 585, at 4–5.) Thus, according to Bona Fide, any invocation of the Acquisition Time Zones in the declaration were not supplementations because they were previously disclosed in the expert report.

The Court first agrees with Bona Fide that Mr. Jans's discussions of the Acquisition Time Zones in his declarations do not amount to new opinions. Contrary to SourceAmerica's contentions, Mr. Jans had in fact incorporated his theory of Time Acquisition Zones throughout his expert report. While he did not always refer to the Time Acquisition Zones by name, it is clear that the foundation of Mr. Jans's expert report was predicated on the Time Acquisition Zones framework. At the outset of his report, Mr. Jans explains that "the focus of this report is the allocation of contracts that happens in Acquisition Time Zones." (ECF No. 535-10, at 20.) He keeps his promise by making reference the different stages of the source-selection process throughout his

report. For example, under Trend 1 of his expert report, in which he discusses SourceAmerica's "[i]nfluence (and control) of entire acquisition process," he identifies how the four stages of the Acquisition Time Zones cohered with the way that SourceAmerica itself marketed its operational procedures. (*Id.* at 32–33.) In that discussion, Mr. Jans identifies how with respect to the Requirements Zone (Zone 1), SourceAmerica would "[c]ollaborate with its subject matter experts to build the Performance Work Statement," how it "[c]onducted Market research and coordinat[ed] site visits" in the Market Research Zone (Zone 2), "[a]dvert[ised] the RFP (as a SSN)" within the Request for Proposal Zone (Zone 3), and "[e]valuated offers, negotiat[ed] and determin[ed] responsive NPA and start up assistance" in the Source Selection Zone (Zone 4). Furthermore, Mr. Jans analyzed at least several of the Opportunities at issue explicitly through the lens of SourceAmerica's conduct at each stage of the Acquisition Time Zones. (*See id.* at 50 (SSN 1690/1741); *id.* at 56 (RFI 1953/SSN 2075).)

With respect to the Acquisition Time Zones, the Court holds that Mr. Jans's declarations do not impermissibly expand beyond what was already inherent and contained in his expert reports. Having compared the declarations to the original report, the Court is satisfied that Mr. Jans's declarations do not present new theories or new evidence. As discussed *supra*, Mr. Jans had timely disclosed in his expert report the Acquisition Time Zones framework and his intent to rely on that schematic to explain SourceAmerica's control over every aspect of the AbilityOne acquisitions process. His expert report contained much more than mere passing reference to the Acquisition Time Zones. The Acquisition Time Zones were as much woven into the fabric of his expert report as they were in his declarations—the only difference is that he referred to them more frequently by name in the latter.

Where, as here, the "declarations contain no new material information and present no opinions that were not provided to [the opposing party] during the course of discovery," there has been no violation of Rule 26(e) and no basis to strike. *Bryant v. Wyeth*, No. C04-1706 TSZ, 2012 WL 11924298, at *3 (W.D. Wash. July 19, 2012). As

Bona Fide points out, "there is no requirement that [Rule 26] disclosures cover any and every objection or criticism of which an opposing party to complain," and consequently, its expert "need not stand mute in response to an opposing party's <u>Daubert</u> motion" and summary judgment motion. (ECF No. 585, at 4 (quoting *Star Ins. Co. v. Iron Horse Tools, Inc.*, No. 1:16cv48-SPW-TJC, 2018 U.S. Dist. LEXIS 45660, at *17 (D. Mont. Feb. 7, 2018).) That is true especially where, as here, Mr. Jans's declarations do not alter any of his theories, *Copper Sands*, 2013 WL 2460349, at *2, and instead "merely expand upon or clarify initial opinions that the [opposing party] had an opportunity to test during discovery." *Wilson Road Dev. Corp. v. Fronabarger Concreters Inc.*, 971 F. Supp. 2d 896, 903 (E.D. Mo. 2013).

In short, the Court finds Paragraphs 48–74 of the Expert Testimony Declaration and Paragraphs 48–76 of the MSJ Declaration to be permissible. Those paragraphs will not be stricken. To the extent that SourceAmerica has raised *Daubert* concerns about the Acquisition Time Zones for the first time in its motion to strike, those challenges are denied as having been waived. (ECF No. 575, at 13–17.) [2] Given that the Acquisition Time Zones were disclosed pursuant to Mr. Jans's initial expert report, any objections thereto should have been mounted with SourceAmerica's motion to exclude his testimony.

### b. Correction of Deposition Testimony

The second basis for SourceAmerica's motion to strike lies in Paragraphs 75–80 of the Expert Testimony Declaration and Paragraphs 77–82 of the MSJ Declaration. Those paragraphs provide background for the errata sheet Mr. Jans submitted to correct an error in his deposition testimony. (ECF No. 558-28, at 167.) At his June 14, 2018 deposition, Mr. Jans was asked "Though you did not review the responses of the eight responding

---

[2]    In any event, the Court is not concerned by SourceAmerica's arguments that the Acquisition Time Zones are not reliable and not peer-reviewed. The Acquisition Time Zones are a conceptual framework, not a test or methodology or technique subject to scientific testing. Moreover, the Acquisition Time Zones adequately fits the particular facts of this case, and will advance the jury's understanding of the issues.

NPAs for opportunity 1483, you, nevertheless, concluded that Bona Fide was the most qualified for opportunity 1483; is that correct?"  After Bona Fide's attorney lodged an objection, Mr. Jans responded, "Yes."  (ECF No. 558-28, at 167 (Sealed).)  The errata sheet indicates that the transcript should be corrected so that "Yes," is replaced by "I did not reach that conclusion."  (ECF No. 558-28, at 167.)

Mr. Jans's declarations expand on the reason for correction provided in the errata; namely that he had been confused by the question posed by SourceAmerica's counsel, and that he had never meant to imply, based off of his response, that he believed that SourceAmerica had been in the business of making its source-selection decisions according to an objective, "best qualified" NPA standard.  (ECF No. 558-28, at 35; *id.* at 167.)  Mr. Jans states that he had not meant to agree with the substance of the question, and that his answer "yes," should be construed as a misunderstanding of the question posed, especially since he had, prior to that point, consistently opined that SourceAmerica selected NPAs based on its own subjective, biased criteria.  (ECF No. 558-28, at 36.)  SourceAmerica contends that Mr. Jans's original deposition testimony should stand as a concession that it was in fact recommending only the best qualified NPA, and that the errata and explanation thereof should be stricken as a new, impermissible departure from that concession.

The Court agrees that the contended statements need not be stricken.  Pursuant to Rule 30(e)(1)(B), Mr. Jans was entitled to make corrections to his deposition transcript so long as he "sign[ed] a statement listing the changes and the reasons for making them."  FED. R. CIV. P. 30(e)(1)(B).  Mr. Jans's timely errata sheet accomplished such a purpose. The Ninth Circuit has approved of supplementations in similar circumstances: "the non-moving party is not precluded from elaborating upon, explaining, or clarifying prior testimony elicited by opposing counsel on deposition [or] minor inconsistencies that result from an honest mistake."  *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995).  Because the paragraphs of the declarations at issue served only to further explain

the circumstances giving rise to the errata, and because there was no dramatic change in opinions expressed, the Court finds no Rule 26 violations.

There are no grounds for granting this part of SourceAmerica's motion to strike.

### c. Interpretation of the Settlement Agreement

Bona Fide has also moved to strike Paragraph 79 of the Expert Testimony Declaration and Paragraph 81 of the MSJ Declaration. In that paragraph, Mr. Jans provided the opinion that "SourceAmerica's 'best efforts' under the Settlement Agreement could have included singling out Bona Fide as a NPA that is new to the program or have been affiliated for some time but are actively pursuing AbilityOne contracts."

The Court agrees that this passage must be stricken because it offers to interpret a legal contract. "[E]xpert testimony [regarding] the interpretation of a contract [is] an ultimate question of law upon which the opinion of an expert may not be given." *Hornish v. King Cty.*, 182 F. Supp. 3d 1124, 1133–34 (W.D. Wash. 2016) (quoting *PMI Mortgage Ins. Co. v. Amer. Int'l Specialty Lines Ins. Co.*, 291 F. App'x. 40, 41 (9th Cir. 2008) (unpublished)). Mr. Jans is not specially trained in law, and cannot be permitted to give any insight as to what obligations, rights, and duties flow from the Settlement Agreement.

SourceAmerica also objects to portions of Mr. Jans's supplemental expert report and deposition answers for engaging in a similar attempt to construe the Settlement Agreement. At issue are comments made by Mr. Jans registering his belief that the Settlement Agreement obligated SourceAmerica to tailor opportunities to suit Bona Fide's specifications and conferred upon Bona Fide a right to preferential treatment, over and above any other NPA which did not have such a contract with SourceAmerica. Although SourceAmerica should have raised these issues as part of the *Daubert* motion, the Court will overlook the dilatory nature of these objections because the testimony they challenge is clearly impermissible. As detailed more closely in the Court's summary judgment order, Mr. Jans's contract interpretation is incorrect. For that reason, and

because Mr. Jans cannot is not qualified to render legal opinions, these opinions will be excluded. *See Nationwide*, 523 F.3d at 1059 (quotation marks and citation omitted) (affirming exclusion of expert legal testimony because it not only invaded the province of the trial judge, but also constituted erroneous statements of law, and permitting it "would have been not only superfluous but mischievous.").

## V.     Motion to Exclude Mary Karen Wills's Expert Testimony

Also pending before the Court is Bona Fide's motion to exclude the expert testimony of Mary Karen Wills.  (ECF No. 561.)  Ms. Wills has been a CPA for 30 years and serves as the leader of the Government Contracts Practice at the Berkeley Research Group, LLC.  (ECF No. 541, at 6 (Sealed).)  SourceAmerica retained Ms. Wills to offer opinions on the regulatory regime governing SourceAmerica's selection process, primarily to rebut Bona Fide's claim that SourceAmerica selected its favored NPAs without regard to fair evaluative procedures when reviewing NPA responses.  Ms. Wills has an extensive experience in federal government procurement laws and regulations. (*Id.*)  She has previously worked with the AbilityOne Program in her capacity as a consultant to a CNA, and to a prime contractor working with an NPA. (*Id.*)

Ms. Wills completed her expert report on January 19, 2018, and submitted a rebuttal report to Mr. Jans's expert report on March 16, 2018.  In those documents, and in her depositions, Ms. Wills has indicated that her testimony will include the following opinions: that SourceAmerica's obligations under the Settlement Agreement were coterminous with its obligations to follow applicable federal regulations in designing and assigning AbilityOne Opportunities, and that SourceAmerica complied with both in its source-selection process with respect to the Opportunities at issue (Opinion 1); that SourceAmerica did not violate any federal conflict of interest policy in assigning the same (Opinion 2); that Bona Fide failed to exhaust available avenues to appeal SourceAmerica's NPA recommendations (Opinion 3); that Bona Fide's Amended and Supplemental Complaints contain false, misleading and inaccurate allegations (Opinion 4); and that the opinion of Bona Fide's expert, Mr. Jans, is not reliable (Opinion 5).

Bona Fide objects to these opinions and moves to exclude Ms. Wills's testimony in full.  It argues that Ms. Wills purports to offer improper legal conclusions, that there is too great an analytical gap between the facts and her opinions, that parts of her opinions require no specialized knowledge, and that her opinions would confuse the jury.  Bona Fide also urges the Court to apply exclusion sanctions under Rule 37 because Ms. Wills did not timely disclose all of the documents she considered in drafting her expert reports, and because she destroyed all of the notes and working papers she authored in the case.  SourceAmerica defends its expert on the grounds that legal opinions are appropriate in cases involving complex regulatory frameworks, that Ms. Wills's expertise would be helpful in guiding the factfinder through labyrinthian regulatory standards, and that any nondisclosure by Ms. Wills was harmless.

### A. Opinion 1: Testimony as to legal issues, contract interpretation, regulatory and statutory regimes, and regulatory compliance

Ms. Wills is prepared to opine that SourceAmerica did not breach its contractual obligations under the Settlement Agreement vis-à-vis the Opportunities in dispute.  As Bona Fide points out, her ultimate conclusion on the matter is derived from a series of constituent opinions.  Those opinions are that SourceAmerica's duties to treat Bona Fide fairly, equitably, and objectively under the Settlement Agreement are the same as its ordinary duties under the governing statute (FAR) and regulations (AbilityOne-specific), that SourceAmerica adequately distilled the essence of those statutes and regulations into its own internal policies, and that, by following its own internal policies when conducting the source-selection process for the disputed Opportunities, SourceAmerica not only complied with the applicable statutory and regulatory demands, but also the terms of the Settlement Agreement.

Bona Fide's primary objection is that Ms. Wills purports to offer an opinion on an ultimate issue of law—i.e., that SourceAmerica did not breach the Settlement Agreement.  Bona Fide claims that Ms. Wills not only attempts to interpret the terms of the Settlement Agreement, but also impermissibly equates its terms with requirements in the Federal

Acquisition Regulations, AbilityOne Commission Policies, and internal SourceAmerica policies. Bona Fide believes that it is a legal opinion for Ms. Wills to testify that SourceAmerica's source-selection process was compliant with regulatory requirements. It further contends that the perniciousness of such an opinion is magnified, where, as here, the expert would testify that compliance with internal SourceAmerica policy and regulations is compliance with the Settlement Agreement.

In response, SourceAmerica retorts that it would welcome a limiting instruction that Ms. Wills cannot opine on whether SourceAmerica breached the Settlement Agreement. It frames Ms. Wills' testimony as providing only "the general regulatory requirements and procedures of the AbilityOne Program and SourceAmerica's compliance therewith," (ECF No. 550, at 7), and as "set[ting] forth necessary background information regarding the regulatory framework as an alternative explanation for SourceAmerica's decision-making that Bona Fide contends was *ad hoc* and standardless." (*Id.* at 13.) SourceAmerica further contends that even though Ms. Wills would testify that SourceAmerica's internal source-selection policies are compliant with the applicable AbilityOne Program regulatory requirements, such an opinion would not be problematic because regulatory compliance is "not the ultimate issue in this case," since the crux of the litigation is "whether SourceAmerica breached the Settlement Agreement under Virginia law." (*Id.* at 14.)

### 1. Permissible testimony: Ms. Wills may testify as to the *general* regulatory framework

Bona Fide is correct that "'matters of law' are generally inappropriate subjects for expert testimony." *Flores v. Arizona*, 516 F.3d 1140, 1166 (9th Cir. 2007), *rev'd on other grounds sub nom. Horne v. Flores*, 557 U.S. 433 (2009). This is especially true when an expert witness purports to offer "an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." *Nationwide*, 523 F.3d at 1058 (citation and quotation marks omitted). Case law states in no uncertain terms that experts are forbidden from testifying to an ultimate legal conclusion. *See*, *e.g.*, *Andrews v. Metro-*

23

*North Commuter R. Co.*, 882 F.2d 705, 708–09 (2d Cir. 1989) (expert in a negligence action may not testify that a defendant railroad company was "negligent"). And with respect to contract interpretation, the law is clear that "testimony cannot be used to provide legal meaning or interpret [a contract] as written." *McHugh v. United Serv. Auto. Assoc.*, 164 F.3d 451, 454 (9th Cir. 1999) (citation omitted).

The Ninth Circuit recognizes a limited exception to the prohibition on legal opinion testimony for "instances in rare, highly complex and technical matters where a trial judge, utilizing limited and controlled mechanisms, and as a matter of trial management, permits some testimony seemingly at variance with the general rule." *Flores*, 516 F.3d at 1166 (quoting *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 101 (1st Cir. 1997). Pursuant to this exception, courts have at times allowed experts to explain the relevant regulatory backdrop of the litigation. The exception is warranted where the Court believes the jury might find the applicable regulatory background complex and confusing. *See, e.g.*, *United States v. Pac. Gas & Elec. Co*, No. 14-CR-00175-THE, 2016 WL 3268994, at *1 (N.D. Cal. June 15, 2016) (permitting expert testimony as to regulations attendant to the Pipeline Safety Act because "expert testimony to help the jury digest this complex regulatory framework is necessary and warranted").

As the parties' extensive briefing on the issue suggests, the applicable regulatory framework is complex. Ms. Wills may therefore be permitted to offer expert testimony as to the *general* standards, criteria, and regulations to be observed by SourceAmerica in designing and assigning Opportunities. Indeed, the regulatory scheme implicated in this matter is certainly at least as complicated as the education law and policy framework presented in *Flores*, and the fact-finder would likely be benefited by an explanation of the applicable standards. Testimony from Ms. Wills describing the existence of those regulations, and the internal policies and procedures developed by SourceAmerica in an attempt to effectuate them, would be elucidating.

**2. Impermissible Testimony: legal analysis, application of statutes, regulations, and internal procedures to SourceAmerica's allocation of the Opportunities at issue.**

However, a large amount of Ms. Wills' preferred testimony sweeps beyond mere background and generalized testimony about the relevant regulatory framework. Indeed, she purports to opine that SourceAmerica complied with statutory, regulatory, and internal requirements in allocating the specific Opportunities at dispute in this case, and that compliance therewith meant compliance with the Settlement Agreement. That is all impermissible testimony. *See CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233-34 (E.D. Cal. 2005) ("While expert testimony may be permissible to describe a complicated agency process, such testimony should not prescribe legal standards to apply to the facts of the case."). The impermissible opinions fall into three categories.

**a. Ms. Wills may not interpret the Settlement Agreement or opine that its terms are equivalent to federal regulations and AbilityOne Commission policies**

Like Mr. Jans, Ms. Wills has offered her own interpretation of the terms of the Settlement Agreement. For example, she states the following in her expert report:

> In my opinion, it is evident from the record underlying each of the opportunities cited in Bona Fide's allegations that SourceAmerica has fully adhered to not only the requirements placed upon it by the AbilityOne Program, but also the requirements contained in the Settlement Agreement, which emphasizes the same requirements as those contained in the AbilityOne regulations and policies.
>
> . . .
>
> Based on the documentation I reviewed, it is evident that SourceAmerica complied with the terms of the Settlement Agreement in making continuous efforts to provide Bona Fide equal access to its services.

(ECF No. 541-1, at 38, 40 (Sealed).) Ms. Wills may not testify to these opinions because experts cannot interpret the terms of a contract or provide legal meaning, especially

where, as here, the interpretation would go to the ultimate issue—i.e., whether SourceAmerica's actions put it in breach of the 2012 Settlement Agreement. *McHugh*, 164 F.3d at 454. This rule also precludes Ms. Wills from purporting to conclude that the terms of the 2012 Settlement Agreement were coterminous with the obligations set out under FAR or AbilityOne Commission policy. Not only is such an opinion an oblique attempt to interpret the contract, but it is also a purely legal opinion, for which Ms. Wills has no authority to issue.

### b. Ms. Wills may not testify that there is no daylight between the applicable regulations and internal SourceAmerica policies and procedures

Similarly, the Court will not permit Ms. Wills to opine on the equivalency of SourceAmerica's internal evaluative procedures and policies and those inscribed in federal regulations.

To show that SourceAmerica followed principled procedures in making its contract assignment decisions, Ms. Wills draws a series of connections between internal SourceAmerica policies on the one hand and federal regulations on the other. Ms. Wills states that SouceAmerica must abide by regulations published at FAR 8.7, 41 CFR Part 51, and by the AbilityOne Commission. Those regulations establish the guidelines, evaluative criteria, and principles applicable to making source-selection decisions. Ms. Wills states that SouceAmerica has incorporated all of those regulations into its internal policies, such that compliance with internal SourceAmerica policy means regulatory compliance. (ECF No. 541, at 19–21 (Sealed).) Ms. Wills also opines that SourceAmerica's conflict of interest policies are the same as those contained in federal regulations. (*Id.* at 25 ("I reviewed each of the above identified [internal SourceAmerica policies] and determined that they appropriately address the requirements of the relevant FAR, 41 CFR 51, and the AbilityOne Commission regulations and policies, including 51.301."))

The Court will not permit such testimony. Whether SourceAmerica's internal policies and procedures embody the same standards as those in federal regulations is a purely legal issue that SourceAmerica is welcome to argue in motions before the Court. It is not, however, an appropriate subject for expert testimony. Moreover, such testimony lies outside of Ms. Wills's expertise as a CPA. Courts are not in the business of allowing experts to opine on whether documents in litigation, such as SourceAmerica's internal policies, meet federal regulatory standards. *See*, *e.g.*, *Stobie Creek Investments LLC v. U.S.*, 608 F.3d 1366, 1383–84 (Fed. Cir. 2010) (affirming exclusion of expert that "sought to testify about whether [a] tax opinion letter met the standards of Treasury Circular 230").

> **c. Ms. Wills may not testify that SourceAmerica complied with FAR, AbilityOne Commission policies, or SourceAmerica internal policies and procedures in designing and assigning the Opportunities challenged by Bona Fide**

It is also clear to the Court that Ms. Wills may not be permitted to testify that SourceAmerica complied with FAR, AbilityOne Commission Policies, or internal SourceAmerica procedures with respect to the Opportunities challenged by Bona Fide. Those opinions are impermissible because they provide a legal conclusion about an ultimate issue, *Mukhtar*, 299 F.3d at 1066 n.10 ("[A]n expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law"), and do no little more for a finder of fact "than tell it what verdict to reach." 29 Wright & Gold, Fed. Prac. & Proc: Evidence § 6264 (1st ed. 1997); *cf. United States v. Perkins*, 470 F.3d 150, 159–60 (4th Cir. 2006) (expert's testimony was admissible because it did not "merely [tell] the jury what verdict to reach").

In this case, the ultimate issue is whether breached its contractual obligations in designing and assigning the Opportunities challenged by Bona Fide. Ms. Wills's proffered testimony goes to this ultimate issue because her theory (and indeed, SourceAmerica's theory upon its motion for summary judgment) is that the Settlement

Agreement requires only regulatory and statutory compliance. Therefore, proffered testimony that SourceAmerica has fulfilled its regulatory and statutory duties (and adequately applied its internal policies) is nothing more a pure legal conclusion on an ultimate issue of law, once removed. It is excludable on that basis.

Even if Ms. Wills had not attempted to draw the impermissible linkages between the Settlement Agreement on the one hand and regulatory compliance on the other, the same outcome would apply. Courts routinely exclude experts from testifying on compliance with regulatory or industry standards—i.e., legal explanations and conclusions. *See, e.g.*, *Pelletier v. Main Street Textiles, LP*, 470 F.3d 48, 54–55 (1st Cir. 2006) (affirming exclusion of "expert testimony about the applicability of OSHA regulations to [defendant]"); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 900 (7th Cir. 1994) (excluding expert testimony regarding compliance with Federal Motor Vehicle Safety Standards); *United States v. S. Ind. Gas & Elec. Co.*, 55 Env't Rep. Cas. (BNA) 1597, 2002 WL 31427523, at *7–8 (S.D. Ind. Oct. 24, 2002) (excluding expert testimony interpreting the Clean Air Act and its accompanying regulations). Although SourceAmerica points out that some courts have at their discretion permitted expert testimony on regulatory compliance, this Court is not prepared to allow the same in this case.

*Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037 (9th Cir. 2012), a case relied upon by Bona Fide, is instructive. At issue was the district court's exclusion of an expert who offered to dissect the defendant's compliance with a regulatory standard, MIL-STD 498, in support of the qui tam plaintiff's theory that Lockheed had defrauded the government under a contract for space launch operations software. MIL-STD 498 was apparently the standard requirement regarding software used in government contracts. *Id.* at 1052. The expert's opinion was offered "to determine whether Lockheed's performance under the contract did in fact violate the requirements of MIL-STD 498." *Id.* The district court excluded the testimony because those opinions amounted to legal conclusions in the context of the case. *Id.* The Ninth Circuit affirmed the district court,

holding that not only was there no rule requiring a district court to accept such testimony, but that, "even if [expert] testimony may assist the trial of fact, the trial court has broad discretion to admit or exclude it." *Id.* at 1053 (quotation marks and citation omitted); *see also Nationwide*, 523 F.3d at 1059 (holding that there is no support for Nationwide's argument "that a district court per se abuses its discretion when it excludes testimony instructing the jury on legal issues"). The same concerns which motivated the district court in *Hooper* to exclude the MIL-STD 498 testimony also animate this Court to exclude testimony as to compliance with FAR, AbilityOne Commission Policies, and internal SourceAmerica policies and procedures.[3]

Furthermore, it is especially concerning to the Court that Ms. Wills's conclusions with respect to the individual Opportunities at issue are couched in terms of disputed contractual language. For example, with respect to Opportunity Notice 1483, Ms. Wills states that not only did SourceAmerica adhere to its internal policies and procedures, FAR 8.7, 41 CFR 51, and Ability One Commission regulations and policies "to objectively assess and recommend the most appropriate NPA based on the requirements included in the Opportunity Notice," but that "SourceAmerica's recommendation was conducted *in a fair, transparent and equitable method without impartiality and without improper preferential treatment of any responding NPA*." (ECF No. 541, at 36 (Sealed) (emphasis added)). This opinion is included at the tail-end of all of her Opportunity-specific discussions. By offering her analysis in the terms of the Settlement Agreement,

---

[3] It should be noted that the Court is not excluding this testimony based on Bona Fide's argument that Ms. Wills used an improper legal standard in arriving at her conclusions, that is, she used the legal standard applicable to Tucker Act bid protests to evaluate whether there was a "rational basis" for each one of SourceAmerica's NPA recommendations. (ECF No. 561-1, at 22; ECF No. 573, at 6.) Based on the record before the Court, there is no evidence that Ms. Wills ever evaluated SourceAmerica's NPA recommendations for rational basis. The few stray sentences in Ms. Wills's deposition relied upon by Bona Fide indicate only that Ms. Wills believed she was qualified as an expert in the AbilityOne procurement process because she had experience with Tucker Act bid protests, and that the two processes were more or less analogous. (ECF No. 573, at 6 (citing ECF No. 573-1, at 13).) Nowhere does Ms. Wills state that she applied a rational basis review of SourceAmerica's NPA recommendation decisions. The Court will not exclude Ms. Wills's proffered testimony on this basis.

(ECF No. 519-4, at 7 (obligating SourceAmerica "to use best efforts to provide that Bona Fide is treated objectively, fairly, and equitably in its dealings with with [SourceAmerica]," and to "use best efforts to provide that Bona Fide is afforded equal access to services provided by [SourceAmerica]")), Ms. Wills's proposed testimony does no more than tell the jury what verdict to reach on the ultimate issue, and must be excluded for that reason. *See Lee*, 2010 WL 11549637, at *10.

## B. Testimony that Bona Fide did not pursue all available appeals to Source America's assignment decisions

Bona Fide next argues that Ms. Wills must be precluded from opining that Bona Fide "did not fully exercise the processes and avenues available to it to appeal" SourceAmerica's assignment decisions. (ECF No. 561-1, at 24.) This critique is aimed at Paragraphs 238–243 of Ms. Wills's report, in which she explained that SourceAmerica had policies in place providing for appeals, that Bona Fide had pursued appeals for only three of the thirteen Opportunities challenged in its pleadings, and that even those three appeals had not been pursued exhaustively. (ECF No. 541-1, at 33–35 (Sealed).) Bona Fide seeks to preclude this failure-to-mitigate testimony pursuant to Rule 702(a) because it believes that Ms. Wills's analysis requires no special expertise, and that the jury could gain the information just by reviewing the internal appeals policies and Bona Fide's exhibits.

With one exception, the objected-to testimony should not be excluded. That Ms. Wills's opinions are based on a review of documents does not automatically make them unhelpful to the trier of fact. Indeed, there are a high volume of documents in this case, many of them involving internal SourceAmerica policy, and others which detail Bona Fide's submissions for consideration on a number of disputed Opportunities. Distilling the contents of those submissions and comparing them to the available internal appeals mechanisms will aid the jury's understanding of the dispute at hand.

The Court is unpersuaded by Bona Fide's reliance on *Beech Aircraft Corp. v. United States*, 51 F.3d 834, 842 (9th Cir. 1995). Bona Fide cites *Beech Aircraft* for the

proposition that a jury is fully capable of examining the exhibits in the record to determine the disputed issue, and that Ms. Wills's proposed testimony is unhelpful as a result. (ECF No. 561-1, at 14.) *Beech Aircraft*, however, stands for a much more limited proposition than Bona Fide suggests. There, the Ninth Circuit affirmed the district court's exclusion of linguistics experts offered to decipher the contents of hard-to-hear tape recordings, holding that "hearing is within the ability and experience of the trier of fact." *Beech*, 51 F.3d at 842. The facts in *Beech* are a far cry from the situation at hand, since the evaluation of NPA responses are not so clearly within the ability and experience of the average person.

Thus, Ms. Wills will not be precluded from offering her assessment that Bona Fide left certain avenues of appeals unexplored. However, it bears repeating that Ms. Wills may not testify that SourceAmerica's internal appeals procedures were in compliance with regulatory standards. Consistent with the Court's decision *supra*, Ms. Wills is precluded from giving the opinion stated in Paragraph 240 of her expert report. (ECF No. 541-1, at 34 ("[T]he appeal process set forth in Source America's procedures for project development distribution and transparency meets the requirements outlined in AbilityOne Policy 51.301 and 41 CFR Part 51-2.6.") (Sealed).)

### C. Testimony as to the validity of Bona Fide's pleadings

Bona Fide seeks to preclude Ms. Wills's testimony that "Bona Fide asserts a variety of factual misrepresentations in its Amended and Supplemental Complaint and Interrogatory Response." (ECF No. 561-1, at 24.) At issue is Ms. Wills's contention at deposition that Bona Fide "knowingly made false statements of fact" in its pleadings, (ECF No. 541-3, at 71–72 (Sealed)), and her conclusion at Paragraphs 61, and 244–247 of her expert report, that "[m]any of [Bona Fide's] allegations cannot be supported by the record and misrepresent SourceAmerica's efforts to treat Bona Fide fairly and equitably in the recommendation process." (ECF No. 541-1, at 35–37 (Sealed).). Bona Fide contends that it is improper for Ms. Wills to impeach the veracity and validity of its allegations, since expert witnesses may not testify as to credibility.

The Court finds the proffered testimony impermissible, but not on the grounds stated by Bona Fide. The cases Bona Fide cites only forbid experts from "testify[ing] specifically to a *witness's* credibility or to testify in such a manner as to improperly buttress a witness' credibility." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989) (emphasis added). They say nothing about whether an expert may impugn the credibility of allegations made by the opposing party in its pleadings.

Nonetheless, the Court is not prepared to allow Ms. Wills to offer what is in effect an opinion on the sufficiency of Bona Fide's legal pleadings. Such testimony is impermissible because "[e]xpert evidence should not be permitted to usurp . . . the role of the jury in applying the law to the facts before it." *1 Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 528 (S.D.N.Y. 2001). If Bona Fide's allegations are factually deficient, then it is the role of the jury, as fact-finder, to so find. To aid the jury in its determination, Ms. Wills may point out where, and in what manner, the *facts* detailed in Bona Fide's allegations do not find support in the documents she reviewed. But she may not make a global indictment of Bona Fide's *legal pleadings*, since this lies outside of her expertise as a government contracting expert.

Moreover, Ms. Wills's characterization of Bona Fide's actions—i.e., that it made "misrepresentations," and "knowingly made false statements of fact,"—carry with them connotations of deceit and willful action, which the Court finds more prejudicial than probative under Rule 403. Quite apart from that, there's no indication that Ms. Wills had any personal knowledge of Bona Fide's state of mind with regards to the statements it chose to include in its pleadings. She therefore cannot purport to testify about the issue. *See Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (unpublished) ("Dr. Schneider's opinion is insufficient to establish falsity adequately because he has no personal knowledge of the facts on which he bases his conclusion.").

### D. Testimony criticizing the opinions of Mr. Jans

Bona Fide also contends that Ms. Wills improperly usurps the Court's gatekeeping role by couching her disagreement with Mr. Jans's opinions in Rule 702 language. (ECF

No. 561-1, at 27.)  Specifically, Bona Fide seeks to preclude Ms. Wills from using words like "unreliable," "meritless," "invalid," and "erroneous," to describe Mr. Jans's methodology, and to prevent her from opining that his conclusions "have no reliable basis in fact."  (*Id.*)

The Court will not exclude this testimony.  Ms. Wills is well within her rights to question the methods and conclusions of a competing expert witness.  As SourceAmerica points out, Ms. Wills's critiques are classic rebuttal testimony.  Just because they are expressed in terms also germane to a *Daubert* analysis does not turn her valid rebuttal testimony into an usurpation of the Court's gatekeeping duties.

### E. Failure to disclose, and failure to preserve Rule 26(a)(2) materials

Finally, the Court will address Bona Fide's contention that Ms. Wills's testimony must be excluded in its entirety pursuant to Rule 37, as a result of her failure to abide by the disclosure requirements in Rule 26(a)(2).  Rule 26 requires an expert like Ms. Wills to issue a written report that discloses, among other things, "the facts or data considered by the witness in forming them."  FED. R. CIV. P. 26(a)(2)(B)(ii).  Rule 37(c)(1) provides that, unless the failure to disclose is harmless, or there exist substantial justification for nondisclosure, evidence not disclosed may be excluded.  *See Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless.")

### 1. Relevant Procedural Background

Ms. Wills acknowledged at a deposition on June 20, 2018, that the materials listed in her deposition did not encompass "the entire universe of documents that [she] reviewed," and that the flash drives she had produced in response to Bona Fide's subpoena "really contained the materials [she] relied upon and not all of the materials [she] considered."  (ECF No. 541-3, at 16, 27–28.)  Ms. Wills further stated that she did not "keep track" of all the materials that she reviewed but did not rely on.  (*Id.* at 10.) Among those missing materials were notes made by Ms. Wills and her staff during their

recreation of SourceAmerica's evaluative process vis-à-vis the Opportunities challenged by Bona Fide. (*Id.* at 50). Ms. Wills represented during the deposition that she would produce those notes if she still had them.

After the deposition, Bona Fide moved to exclude her testimony pursuant to Rule 37. Bona Fide contended that Ms. Wills neglected to timely disclose in her written report "all of the materials that she considered in formulating her opinions." (ECF No. 561-1, at 29.) In response to Bona Fide's motion, SourceAmerica submitted a declaration from Ms. Wills that advised for the first time:

> At deposition, I testified that I did not know whether my notes and working papers, including my own evaluations of NPA responses, were produced to Bona Fide. *It is not my practice to keep working papers, notes, or drafts, once I prepare final expert reports. After my deposition, I verified that I followed this practice and all notes, working papers, and drafts were not retained once my Expert and Rebuttal Reports were each finalized.* My own evaluations of NPA responses are entirely incorporated within my Expert Report; I did not create any additional analyses of NPA responses other than the analysis included in my reports. Further, all documents cited in support of those analyses were provided to Bona Fide prior to my deposition.

(ECF No. 550-1, at 3 (emphasis added.))

Upon receiving this information, Bona Fide doubled-down on its request to exclude Ms. Wills's testimony, this time, for failing to preserve her working notes (ECF No. 573, at 10–11).[4] Bona Fide's motion puts two issues before the Court: (1) are notes and working papers subject to disclosure under Rule 26(a)(2), and (2) if so, are exclusion sanctions under Rule 37 warranted in the event of their destruction?

## 2. Analysis

The disclosure mandated by Rule 26(a)(2) includes any facts or data considered by the expert in forming their opinion. *See Lucent Techs. Inc. v. Microsoft Corp.*, No. 07-CV-2000 H (CAB), 2010 WL 11442894, at *2 (S.D. Cal. Dec. 16, 2010). Courts have

---

[4] Ms. Wills stated in her declaration that all of the materials she had relied on, except for her working notes, had since been produced to Bona Fide.

adopted a very broad understanding of what it means for material to have been "considered" by an expert for the purposes of Rule 26(a)(2).

Working papers or notes generated by an expert would ostensibly fall within the bounds of "considered" materials. For example, courts have defined materials "considered" as "anything received, reviewed, read, or authorized by the expert, before or in connection with the forming of his opinion, if the subject matter relates to the facts or opinions expressed." *Euclid Chem. Co. v. Vector Corrosion Techs. Inc.*, No. 1:05CV80, 2007 WL 1560277, at *4 (N.D. Ohio May 29, 2007) (footnotes and citations omitted). Rule 26(a)(2) has also been construed to require the disclosure of any materials authored by the expert during their consultation. *Sec. & Exch. Comm'n v. Reyes*, 2007 WL 963422, *1 (N.D. Cal. Mar. 30, 2007) ("When experts serve as testifying witnesses, the discovery rules generally require the materials reviewed or generated by them to be disclosed . . . .").

However, some courts have held to the contrary. Relying principally on a First Circuit decision, *Gillespie v. Sears, Roebuck & Co.*, 386 F. 3d 21, 34–35 (1st Cir. 2004), courts have held that the requirement to disclose any materials considered by the expert does not include working notes. *Id.* ("Gillespie claims that this expert discovery rule itself required the working notes because it requires a report stating the expert's opinions and reasoning and 'the data or other information considered by the witness in forming the opinions.' But this language does not require that the expert report contain, or be accompanied by, all working notes or recordings . . . ") (citing FED. R. CIV. P. 26(a)(2)(B)).

The Court, however, need not reconcile the conflicting law on the disclosure of expert working notes. Even if Ms. Wills did in fact have a duty to disclose her notes in accordance with Rule 26(a)(2), her failure to preserve was harmless and exclusion sanctions are therefore not necessary.[5]

---

[5] The Court agrees with Bona Fide that there was no substantial justification for Ms. Wills's destruction of her notes. FED. R. CIV. P. 37(c)(1). As Bona Fide has pointed out, it is not enough for

Bona Fide argues it suffered prejudice, and that Ms. Wills's actions were not harmless under Rule 37(c)(1). It claims it has been deprived of a meaningful opportunity to cross-examine Ms. Wills on her conclusions and any intervening findings she might have made in her working papers at variance with her ultimate report. The Court finds that while prejudice might lie in the ordinary case, *see In re Mirena IUD Products Litig.*, 169 F. Supp.3d 396, 472 (S.D.N.Y. 2016) ("Allowing Dr. Hixon to testify without having fully disclosed the bases for her opinions is harmful to Plaintiffs because they cannot effectively cross-examine her."), the destruction of Ms. Wills's working papers do not seem particularly prejudicial in light of the factual particulars of *this* case.

Ms. Wills stated in her declaration that her working paper "evaluations of NPA responses are entirely incorporated within [her] Expert Report." (ECF No. 550-1, at 3.) That being the case, Bona Fide could simply cross-examine Ms. Wills on the methods and analysis enclosed in her final expert report. Indeed, similar quandaries were presented in *Patel v. Verde Valley Med. Ctr.*, No. CV051129PHXMHM, 2009 WL 5842048 (D. Ariz. Mar. 31, 2009) and *Tipp v. Adeptus Health Inc.*, No. CV-16-02317-PHX-DGC, 2018 WL 447256 (D. Ariz. Jan. 17, 2018). The analyses of those courts are instructive.

In *Patel*, the defendants argued that the plaintiff's expert "should be excluded because he destroyed his notes." 2009 WL 5842048, at *1. However, the district court "decline[d] to exclude Dr. Dobson's testimony merely because he discarded his notes," since "Defendants are free to raise th[e] issue as a means of attacking Dr. Dobson's credibility with the jury if they so desire." *Id.* Similarly, the district court in *Tipp*

---

Ms. Wills to state that it was her general practice to discard her working notes. (ECF No. 573, at 10.) Indeed, Ms. Wills's general practice does not diminish the force of Bona Fide's argument—submitted upon a request for judicial notice, hereby granted—that the relevant professional standards for CPAs like Ms. Wills recommend her to "prepare and maintain documentation," including "working paper documentation (including electronic mail, spreadsheets, and correspondence)," since "the form and content of working papers and . . . related documentation may also be subject to discovery depending upon the role of the practitioner." (ECF No. 573-2, at 16, 17 ("Litigation Services and Accountable Professional Standards," by the American Institute of Certified Public Accountants)).

3:14-cv-00751-GPC-AGS

considered whether the defense's witness should be precluded from testifying as to her investigation because she had her shredded handwritten notes. Like Bona Fide, the plaintiff in *Tipp* sought to exclude the witness on the grounds that the "handwritten notes were relevant and may have included additional or inconsistent information." 2018 WL 447256, at *5. The court rejected plaintiff's argument on the grounds that any potential harm could be cured by permitting plaintiff "to present evidence of [the witness's] destruction of the handwritten notes," and "to argue to the jury that the notes could have been helpful to her case." *Id.*

The Court is not prepared to exclude Ms. Wills in light of the considered opinions articulated in *Tipp* and *Patel*. If the matter is set for trial, Bona Fide will be permitted to cross-examine Ms. Wills regarding her destruction of her notes and working papers, and to challenge her credibility for having done so. No additional sanctions are warranted.

## VI. Conclusion

Consistent with the above analysis, Bona Fide's motion to exclude the testimony of Mary Karen Wills is **granted in part** and **denied in part** (ECF No. 561). SourceAmerica's motion to exclude the testimony of Kevin M. Jans is also **granted in part** and **denied in part** (ECF No. 521). SourceAmerica's motion to strike portions of Mr. Jans's declarations is also **granted in part** and **denied in part** (ECF No. 575).

Dated: March 26, 2019

Hon. Gonzalo P. Curiel
United States District Judge

3:14-cv-00751-GPC-AGS