UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BONA FIDE CONGLOMERATE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SOURCEAMERCA; PRIDE INDUSTRIES, INC.; KENT, CAMPA & KATE, INC.; SERVICESOURCE, INC.; JOB OPTIONS, INC.; GOODWILL INDUSTRIES OF SOUTHERN CALIFORNIA; LAKEVIEW CENTER, INC.; THE GINN GROUP, INC.; CORPORATE SOURCE, INC.; CW RESOURCES; NATIONAL COUNCIL OF SOURCEAMERICA EMPLOYERS; and OPPORTUNITY VILLAGE, INC.,<br><br>Defendants. | Case No.:  3:14-cv-00751-GPC-AGS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART SOURCEAMERICA'S MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>**[ECF No. 527]** |
| SOURCEAMERICA,<br><br>Counterclaimant,<br><br>v.<br><br>BONA FIDE CONGLOMERATE, INC.; and RUBEN LOPEZ,<br><br>Counterdefendants. | |

Pending before the Court is defendant SourceAmerica's July 13, 2018 motion for summary judgment or, alternatively, partial summary judgment on Plaintiff Bona Fide Conglomerate's tenth cause of action—breach of contract.  (ECF No. 527.)  The motion has been fully briefed.  (ECF Nos. 555, 579.)

Relevant to the disposition of this motion are the parties' dueling *Daubert* motions to exclude each others' expert witnesses.  Both parties have designated experts to opine on Bona Fide's claim that SourceAmerica breached the 2012 Settlement Agreement ("Settlement Agreement") in its recommendations of Non-Profit Agencies ("NPAs") for Opportunities within the federal government's AbilityOne procurement program.  Bona Fide's motion to exclude SourceAmerica's expert, Mary Karen Wills (ECF No. 561), has been granted in part and denied in part (ECF No. 620), and SourceAmerica's motion to exclude Bona Fide's expert, Kevin M. Jans (ECF No. 521), and its related motion to strike parts of his declarations (ECF No. 575), have also been granted in part and denied in part.  (ECF No. 620.)  The discussion below incorporates only those parts of the experts' analyses that remain as a result of the Court's order.

The Court held a hearing on this motion on November 16, 2018.  At that hearing, the Court issued a tentative ruling with respect to contract interpretation, breach, and causation.  Thereafter, Bona Fide requested, and was granted leave to file supplemental briefing on the issue of proximate cause.  (ECF Nos. 594 (Ex Parte Motion for Leave to File Supplement); 600 (Order Granting); 604 (Supplemental Briefing)).  SourceAmerica was given an opportunity to rebut the supplemental papers.  (ECF No. 607.)

Having considered the applicable law and the parties' arguments, the Court will **GRANT IN PART AND DENY IN PART** SourceAmerica's motion for summary judgment.  The Court will construe the Settlement Agreement as a matter of law, and using that interpretation, grant summary judgment with respect to Opportunities Nos. 1692, 1944, 2075, 2161, 2379, and 2318.  Summary judgment will be denied as to

Opportunities 1483, 1741, 2693, 2705, and 2783.  (ECF No. 527.)[1]

# I.  PROCEDURAL AND FACTUAL BACKGROUND

Because much of the factual background of this case is familiar to the parties, the Court will provide a summary of only the facts relevant to Bona Fide's breach of contract claim.

## A. General Background on AbilityOne and SourceAmerica

The AbilityOne Program is a public-private procurement system designed to fulfill the objectives of the Javits-Wagner-O-Day ("JWOD") Act, 41 U.S.C. § 8501 *et seq.*, by requiring federal agencies to purchase select products and services from Non-Profit Agencies ("NPA"s) that provide employment and training opportunities for persons who are blind or have severe disabilities.  41 C.F.R. § 51-1.1.  The AbilityOne Program is administered by the AbilityOne Commission ("AbilityOne Commission")[2], an independent federal agency which operates under the federal regulations at Federal Acquisition Regulation ("FAR") 8.7 ("Acquisition from Nonprofit Agencies Employing People Who Are Blind or Severely Disabled"), and the AbilityOne Program-specific requirements at 41 C.F.R. Chapter 51 ("Committee for Purchase from People Who Are Blind or Severely Disabled").

SourceAmerica is one of two national organizations designated by the AbilityOne Commission as a Central Nonprofit Agency ("CNA").  As a CNA, SourceAmerica assists

---

[1]     The Court has considered all of the arguments presented in connection with the foregoing motion, even those not discussed in this Order.  If an argument is not explicitly addressed, the parties may assume that it has been rejected.  Specifically, the Court rejects SourceAmerica's argument that it is entitled to derivative sovereign immunity under *Campbell-Ewald Co. v. Gomez*, --- U.S. ----, 136 S. Ct. 663 (2016).  As Bona Fide point outs, that case narrowly circumscribed the derivative immunity available to government contractors, and in addition, was decided upon the contractor's tortious conduct. SourceAmerica has not provided support for the notion that derivative immunity can apply to breach of contract claims.

        The parties also have submitted reams of evidentiary objections.  To the extent that the objected-to evidence is admissible, the Court has considered it; to the extent that it is inadmissible, the Court has ignored it.

[2]     The AbilityOne Commission was previously known as the AbilityOne Committee.

NPAs participating in the AbilityOne Program, "functions as a technical evaluation panel and makes recommendations to the Commissions on the qualifications and abilities of prospective nonprofit agencies to perform the work." *Nat'l Telecommuting Inst., Inc. v. United States*, 123 Fed. Cl. 595, 598 (2015). Under the Nonprofit Agency Recommendation Process, SourceAmerica designs and publishes Opportunity Notices, or Sources Sought Notices ("SSNs"), to the NPAs for consideration and response.

First, SourceAmerica communicates with the procuring government agency, i.e., the federal customer, about its need for a particular service, whether it is for grounds maintenance, or IT, or custodial services. Then, based on those inputs, SourceAmerica crafts Opportunity Notices, which communicate to NPAs the particular scope and requirements of the service sought. Each Opportunity Notice includes a description of the requirement, the estimated dollar value, and any special requirements or preferences of the federal contracting agency that will award the contract. Sometimes, Opportunity Notices will require responding NPAs to possess certain certifications, like security clearance. Other times, they will express preferences for NPAs with geographic experience, or other such criteria. By and large, most Opportunity Notices ask the responding NPA to provide a detailed account of their financial sustainability, and to discuss their past performance of similar services.

After collecting responses from interested NPAs, SourceAmerica assesses the NPAs' proposals for their ability to perform the service requested and the thoroughness of their response. Based off of its appraisal, SourceAmerica selects one NPA to recommend to the AbilityOne Commission for approval. With rare exception, the AbilityOne Commission will generally accept SourceAmerica's recommendation as the contractor. The entirety of this process has been interchangeably referred to by the parties as the source-selection process, the acquisitions process, the NPA recommendation process, among other things.

SourceAmerica's involvement in the NPA recommendation process is guided by policies and regulations from several different sources. First are the policies promulgated

by the AbilityOne Commission. Those policies require SourceAmerica to "develop processes for project assignment and order allocation that result in fair, equitable, and transparent distribution of opportunities among NPAs, taking into account the unique mission and objectives of the AbilityOne Program." AbilityOne Policy 51.301(6)(a) (approved May 30, 2012). They also mandate that SourceAmerica make its assignment and allocation decisions based on the following criteria:

i.    NPAs that can meet the customers' technical and delivery requirements, while maximizing labor hours for people with significant disabilities;

. . .

ii.    The CNAs shall consider the impact of project assignment or allocation on establishment and sustainment of employment of people who are blind or who have other significant disabilities in the AbilityOne Program.

iii.    CNAs shall consider qualitative and quantitative factors in making a decision.

    a.   CNAs shall implement criteria that include the following minimum standards for NPAs to be eligible for an assignment or allocation:

        1.  NPA(s) must be in good standing in accordance with the CNA's policies and the definition herein.

        2.  NPA(s) must be capable of providing all contractual requirements by the Government-established date of performance.

        3.  NPAs must agree to fulfill all legal requirements of the contract, to include flow-down clauses.

        4.  NPAs shall properly document all subcontracts, acknowledging within them the Commission's authority regarding both subcontracting policy and determination of the fair market price.

        5.  NPA(s) must have appropriate financial and management qualifications related to capital intensive products and services, including Base Supply Center (BSC) operation.

    b.  Special consideration may be provided in certain circumstances including, but not limited to:

1. NPA(s) that have lost AbilityOne work due to no fault of their own.

2. NPA(s) that have adopted the Quality Work Environment (QWE) initiative, demonstrated by submission to their CNA of a self assessment and current action plan.

3. NPA(s) targeting and/or employing a significant number of wounded warriors, service-disabled veterans or veterans with significant disabilities.

4. NPA(s) demonstrating initiative in meeting or exceeding laws, regulations, Executive Orders and industry standards on the manufacture and use of environmentally preferable products.

5. CNAs will determine if special considerations are warranted. This determination will be documented by the CNA and, upon request, included in documents provided to the Commission for review when products and services are being considered for addition to the Procurement List.

AbilityOne Policy 51.301(6)(b).

In addition to the AbilityOne Policy, SourceAmerica, as a CNA, is expected to abide by the regulations that directly bear on the Commission. In that respect, 41 CFR § 51-2.4 obligates SourceAmerica to consider whether the NPAs seeking recommendation could fulfil the requirement of "satisf[ying] the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules by the time it assumes responsibility for supplying the Government." 41 CFR § 51-2.4(a)(3).

Furthermore, FAR 1.102, which sets out the uniform policies and procedures for acquisition by all executive agencies, provides the guiding principles for the Federal Acquisition System as a whole. They state that the Federal Acquisition System will:

(1) Satisfy the customer in terms of cost, quality, and timeliness of the delivered product or service by, for example—

(i) Maximizing the use of commercial products and services;

6

(ii) Using contractors who have a track record of successful past performance or who demonstrate a current superior ability to perform; and

(iii) Promoting competition;

(2) Minimize administrative operating costs;

(3) Conduct business with integrity, fairness, and openness; and

(4) Fulfill public policy objectives.

48 CFR § 1.102(b).

## B. Prior Interactions of the Parties

Bona Fide is an NPA that has previously applied for, and obtained, a number of AbilityOne Opportunities. Those include five custodial and grounds maintenance contracts. As a result of several unsuccessful bids, Bona Fide sought to challenge certain Opportunity assignments made by SourceAmerica in the Federal Court of Claims. Those disputes resulted in the signing of the July 27, 2012 Settlement Agreement at the center of this summary judgment motion. (ECF No. 519-4, at 7.)

In exchange for the release of Bona Fide's claims against it, SourceAmerica pledged, pursuant to section 1.2 of the Settlement Agreement, "to use best efforts to provide that Bona Fide is treated objectively, fairly, and equitably in its dealings with [SourceAmerica], with specific attention to contract allocation." (*Id.*) It also committed to "use best efforts to provide that Bona Fide is afforded equal access to services provided by [SourceAmerica] including regulatory assistance; information technology support; engineering, financial and technical assistance; legislative and workforce development assistance; communications and public relations expertise; and an extensive training program," and to "reasonably monitor Bona Fide's participation in the AbilityOne Program for a period of three (3) years." (*Id.*)

Since the parties entered into the Settlement Agreement, Bona Fide has submitted

proposals for, or expressed interest in, approximately fifteen Opportunities administered by SourceAmerica. SourceAmerica has not recommended Bona Fide for any of these Opportunities, and Bona Fide has accordingly not received any of the contract awards.

Bona Fide believes that it was punished for pursuing its prior bid protests in the Federal Court of Claims. (ECF No. 128, at 25.) Bona Fide's beliefs were informed in part by the observations of Ms. Jean Robinson who, as the then-General Counsel for SourceAmerica, was tasked with monitoring SourceAmerica's interactions with Bona Fide. (*Id.*) Ms. Robinson communicated with Ruben Lopez, Bona Fide's CEO, about various abuses and conflicts of interests she observed during the course of her monitorship. Specifically, she explained to Mr. Lopez that SourceAmerica and certain other "cartel" NPAs acted in concert to pre-determine source-selection based not on merit, or AbilityOne procedure, but rather according to favoritism and self-interest.

## C. The Breach of Contract Claim

In 2014, Bona Fide filed a complaint in federal court against SourceAmerica and a number of other NPAs. As a result of protracted litigation, only one of Bona Fide's original causes of action remains pending before the Court. That is Bona Fide's breach of contract claim, in which it alleges that SourceAmerica had defaulted on the obligations in the Settlement Agreement. (*See* ECF No. 1, at 25 (Original Complaint), ECF No. 128, at 92 (Amended Complaint), ECF No. 267 (First Supplemental Complaint)).

Bona Fide alleges that SourceAmerica breached the Settlement Agreement by (1) failing to treat Bona Fide objectively, fairly, and equitably in its NPA recommendation process; (2) subverting Ms. Robinson's good-faith efforts to monitor Bona Fide's participation in AbilityOne; and (3) not making any efforts whatsoever to provide Bona Fide with equal access to SourceAmerica services. (ECF No. 128, at 93.) Specifically, Bona Fide complains that SourceAmerica improperly used its role as a CNA to funnel contracts towards its favored NPAs and away from Bona Fide, preventing it from being recommended for the following 11 AbilityOne Opportunities: 1483 (Ft. Hood), 1692 (Lakewood), 1690/1741 (DOD-IT), 1944 (USCG HQ), 2075 (NGA), 2161 (Puerto Rico),

2379 (USDA), 2381 (Capitol), 2693 (Wright-Patterson), 2705 (Shaw AFB), and 2783 (Chicago).[3]

### D. SourceAmerica's Motion for Summary Judgment

SourceAmerica has moved for summary judgment on three items. (ECF No. 527.) First, it asks the Court to construe its obligations under the Settlement Agreement as a matter of law, contending that contract interpretation should not be left to the jury. SourceAmerica would have the Court construe section 1.2 as imposing on it no obligation other than what is already expected of it under the pre-existing web of FAR regulations and AbilityOne policies. It further interprets its obligations under those regulations and policies as a duty to recommend only the "best qualified" NPA.

Second, SourceAmerica contends that there is no genuine issue as to whether it breached the Settlement Agreement under its proffered interpretation. That is, it argues that it has not breached the Settlement Agreement because it recommended only the "best qualified" NPA for each Opportunity challenged by Bona Fide.

Finally, consistent with its argument that there was no breach, SourceAmerica urges summary judgment with respect to causation, because Bona Fide cannot establish that any alleged breach caused it damages.

Bona Fide counters that factual issues as to contract interpretation preclude summary judgment. In the alternative, it argues that the Settlement Agreement should be interpreted with the parties' prior disputes in mind, and that SourceAmerica's obligations thereunder are not coterminous with its ordinary statutory and regulatory duties.

## II. Legal Standard

### A. Summary Judgment

On a motion for summary judgment, the Court must determine whether, viewing

---

[3] Originally, Bona Fide made allegations regarding several other Opportunities—i.e., Opportunity Nos. 2410, 10709/090705, 1065, 1108, 1723, 2808, 2410 and RFI 1953. However, several of these Opportunities (Nos. 10709/09075, 1065, 1108) pre-date the Settlement Agreement and are subject to the release contained therein. In addition, Bona Fide has relinquished any claims of damages as to the remainder (Nos. 1723, 2808, RFI 1953, 2410). Summary judgment as to those Opportunities is proper.

the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact. *Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 609–10 (9th Cir. 2003); FED. R. CIV. P. 56. An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.*

When the non-moving party bears the burden of proving the claim, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citation omitted). The moving party need not disprove the other party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) (internal quotations and citation omitted).

If the moving party meets its initial burden of informing the Court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact, the non-moving party must then set forth, by affidavit or as otherwise provided in Rule 56, facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 250. To the extent that the non-moving party does not specifically and distinctly argue that factual disputes present a genuine issue of material fact, the court will not "manufacture arguments" on its behalf. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).

A few words must be said about the quantum and quality of evidence marshalled pro and contra summary judgment. First, only admissible evidence may be considered in deciding a motion for summary judgment. *Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d

1179, 1181 (9th Cir. 1988). Even assuming admissibility, "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun*, 509 F.3d at 984 (citations omitted). In other words, if "the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50.

## B. Breach of Contract under Virginia Law

The Settlement Agreement provides that Virginia law governs an action for its breach. Under Virginia law, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach or obligation." *Filak v. George*, 267 Va. 612, 619 (2004).

With respect to the first element—the existence of a legally-enforceable obligation—the Virginia Supreme has announced a general rule that "a contract made in violation of a statute is void." *Taylor Thiemann & Aitken v. Hayes*, 244 Va. 198, 200 (1922). Thus, "when a plaintiff must rely on the illegal contract to establish his cause of action, he may not recover for damages otherwise due him." *Id.*

With respect to the third element—causation—the party claiming lost profits must prove that its damages were "proximately caused by [the defendant's] wrongful conduct." *Hop-In Food Stores, Inc. v. Serv-N-Save, Inc.*, 247 Va. 187, 190 (1994). To that end, Bona Fide must demonstrate—to "a reasonable certainty"—"a causal connection between [SourceAmerica's] wrongful conduct and the damages asserted." *Saks Fifth Avenue, Inc. v. James, Ltd.*, 272 Va. 177, 189 (2006). Virginia's standard for proximate cause does not require Bona Fide to establish causation with absolute "certainty as to exclude every other possible conclusion," *Wooldridge v. Echelon Serv. Co.*, 243 Va. 458, 461 (1992), but rather, commands that "speculation and conjecture cannot form the basis of the recovery." *Shepherd v. Davis*, 265 Va. 108, 125 (2003) (quotation marks and internal citations omitted).

### III. Construing SourceAmerica's Obligations under the Settlement Agreement as a Matter of Law

The parties dispute both whether the terms of the Settlement Agreement should be interpreted upon a motion for summary judgment, and what they should be construed to mean.

### A. Contract Interpretation Principles Applicable to Summary Judgment

Courts may construe contracts on summary judgment, provided that the terms of the agreement are not ambiguous. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). "Where contractual language is susceptible to more than one reasonable interpretation,"—i.e., the contract is ambiguous—"summary judgment is ordinarily improper because 'differing views of the intent of parties will raise genuine issues of material fact.'" *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 848 (9th Cir. 2004) (quoting *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997)); *see also Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("[A]mbiguity in a contract raises a question of intent, which is a question of fact precluding summary judgment.").

If a contract is ambiguous, courts may at their election turn to extrinsic evidence to discern the intent of the parties to see if there is a "genuine issue of material fact" as to intent lying therein. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). If, after such an inquiry, and construing the evidence in the non-movant's favor, the ambiguity cannot be resolved reasonably consistent with the non-movant's position, summary judgment must be granted. *S. Cal. Gas*, 336 F.3d at 889.

### B. SourceAmerica's Interpretation

The parties posit starkly different interpretations of the "best efforts" provisions in section 1.2.

SourceAmerica contends that the plain terms of the Settlement Agreement,

requiring it to use its "best efforts" to treat Bona Fide "objectively, fairly, and equitably," "with specific attention to contract allocation," obliged it to afford to Bona Fide no more than the baseline treatment it affords to all other NPAs—that is, to treat them objectively, fairly, and equitably, without preferential treatment. (ECF No. 527, at 12–13.) SourceAmerica also denies that the other "best efforts" provision—obligating it to use best efforts to afford Bona Fide "equal access to services provided by [SourceAmerica]" meant that it had to furnish Bona Fide with any special training it does not offer to other NPA affiliates. (*Id.*)

### C. Bona Fide's Interpretation

Bona Fide, on the other hand, vigorously argues that construction of the phrase "best efforts" is inappropriate for summary judgment disposition. It cites to a number of decisions which have counseled against interpreting "best efforts" provisions on summary judgment. *See, e.g.*, *Northrop Grumman Computing Sys. v. United States*, 93 Fed. Cl. 144, 150–51 n.7 (2010), *rev'd on other grounds*, 709 F.3d 1107 (Fed. Cir. 2013).

Under Bona Fide's competing interpretation, the "best efforts" clauses imposed on SourceAmerica a duty to perform with "a higher degree and grade of service" than the "ordinary and reasonable efforts implied by law" "where there is no such contract." *Hatton v. Mountford*, 105 Va. 96, 103 (1906). Bona Fide interprets the contract to mean that SourceAmerica must "ensure Bona Fide was treated like [those previously] favored NPAs to redress the negative effects perpetrated on Bona Fide," i.e., "to nurse Bona Fide back to health," and provide Bona Fide with the same kind and degree of assistance and service that it was offering to those few NPAs. (ECF No. 558-1, at 20; ECF No. 558-2, at 108.) Bona Fide CEO Ruben Lopez views section 1.2 as an obligation to treat Bona Fide equally to "[t]he other NPAs [that] were being treated lavishly." (ECF No. 558-2, at 108.)

Bona Fide finds support for its interpretation in the recitals to the Settlement Agreement, which recounts Bona Fide's former bid protest allegations that SourceAmerica. It argues that the "best efforts" clauses must be understood as atonement

for SourceAmerica's prior wrongs.  It also argues that if the "best efforts" obligations were interpreted to hold SourceAmerica to no more than its ordinary duties, Bona Fide would have effectively bargained away its right to make a bid protest for nothing.  Such a reading, Bona Fide contends, "would eliminate the valuable consideration which SourceAmerica gave Bona Fide in exchange for [Bona Fide] dismissing the prior claims against it."  (ECF No. 555, at 25.)

### D. The Court will construe the contract as a matter of law because there is no ambiguity or factual disputes precluding interpretation on summary judgment

The Court holds that there is no ambiguity in the Settlement Agreement and that it may be interpreted on summary judgment.  The authorities relied on by Bona Fide indicate that fact issues may preclude summary judgment when the contract involves a "best efforts" clause.  But Bona Fide has not pointed to any factual issues that would preclude summary judgment resolution in this case—in fact, all of its arguments are addressed to what may be gleaned from the language, framework, and context of the Settlement Agreement itself.

SourceAmerica's duties under section 1.2 is clear, and its duties are exactly as the contract states.  SourceAmerica must diligently act to treat Bona Fide fairly, objectively, and equitably, especially when it comes to Opportunity assignment, and with respect to provision of SourceAmerica services.  The text does not say that SourceAmerica must afford Bona Fide special treatment or substantive boosts in consideration.  While the phrase "best efforts" might imply exceptional, rather than ordinary duties, that phrase is immediately tempered by the ensuing phrases: "to treat *fairly, objectively, and equitably*," or "to provide . . . equal access to services."  Thus, section 1.2 is not an unfettered promise by SourceAmerica to expend its best efforts to make sure that Bona Fide will win a pro rata distribution of AbilityOne Opportunities.  It is instead a promise to make best efforts to comply with applicable evaluative and support measures.

None of Bona Fide's contentions persuade the Court otherwise.  The recitals cited

3:14-cv-00751-GPC-AGS

by Bona Fide (i.e., Recital D) does nothing to alter the meaning of section 1.2; the recitals by SourceAmerica (i.e., Recital E), clarify that SourceAmerica had denied that it had engaged in any wrongdoing. (ECF No. 519-4, at 7.) Therefore, Bona Fide's recitals cannot be offered as proof that the "best efforts" language entails an obligation on SourceAmerica to right the wrong Bona Fide believes it has suffered. They certainly cannot be offered to justify Bona Fide's interpretation that it was owed the same kind of favoritism and "lavish" treatment that motivated Bona Fide's bid protests in the first place.

Critically, if Bona Fide's interpretation were to prevail, then the Settlement Agreement would be unlawful and unenforceable. As SourceAmerica observed, it had no authority to promise anything other than its ordinary procedures: "[t]he existence of a settlement agreement does not permit the [government] contracting agency to act in ways not otherwise permitted by applicable statutes and regulations." *WHR Grp. Inc. v. United States*, 121 Fed. Cl. 673, 678 (2015). Caselaw on bid protests counsels that "expectations about future procurements," as may arise as a result of settlement agreements, "may not reasonably include an assumption that agencies will disregard statutory and regulatory requirements." *York Int'l Corp.*, B-244748, 1991 WL 218506, at *2 (Comp. Gen. Sept. 30, 1991) (citing *Techplan Corp.*, B-234151, 1989 WL 237486 (Comp. Gen. May 12, 1989)). In fact, "[t]he integrity of the government procurement process requires that contracting officials not be permitted to enter into ancillary agreements . . . promising to disregard applicable government-wide statutes and regulations." *Id*. at *3. Bona Fide's proffered interpretation cannot reasonably be reconciled with the regulatory text, and must be rejected on that basis.

Moreover, contrary to Bona Fide's assertion, SourceAmerica's reading does not render the Settlement Agreement "meaningless." (ECF No. 555, at 25.) Section 1.2 was not the only consideration that SourceAmerica gave in exchange for Bona Fide releasing its bid protests against it. ████████████████████████████████

████████ (ECF No. 535-2, at 12.) Section 1.1 vitiates Bona Fide's argument that it

would have received no consideration whatsoever without its interpretation of section 1.2. Moreover, the fact that this matter is before this Court is proof enough that section 1.2 was not merely some illusory promise. By virtue of section 1.2, Bona Fide secured the valuable consideration of being permitted to sue SourceAmerica in contract. Without section 1.2, Bona Fide presumably would have been limited to pursuing administrative remedies and instigating bid protests in the Federal Court of Claims.

As such, the Court has no difficulty in concluding that the Settlement Agreement can be interpreted as a matter of law upon summary judgment.[4] The Court rejects Bona Fide's interpretation that SourceAmerica has an obligation to treat it lavishly, single it out for favorable treatment, or to furnish it with special services or access not granted to other NPAs. The Settlement Agreement requires only that SourceAmerica treat Bona Fide fairly, objectively, and equitably in its Opportunity assignment decisions and in receiving SourceAmerica assistance and support.

## IV. Breach

SourceAmerica has also moved for summary judgment as to breach. It argues that Bona Fide can establish breach only if it can show that it was the "best qualified" NPA for each Opportunity at issue, and that SourceAmerica had chosen a different NPA in spite of its qualifications.

The Court finds that SourceAmerica's view of breach is predicated on an incorrect legal premise, and that Bona Fide has set forth sufficient evidence to demonstrate that genuine issues of material fact exist with respect to whether SourceAmerica breached its contractual obligations. Thus, summary judgment as to breach is improper.

---

[4] The parties have also offered various extrinsic evidence with regard to the disputed clause. They have put forth interpretations of various Bona Fide and SourceAmerica personnel (*see, e.g.*, ECF No. 555-1, 11–12, ECF No. 527-1, at 17), as well as expert testimony purporting to construe the same. (*See* ECF No. 535–10, at 59 (Expert Report of Kevin M. Jans); ECF No. 558-28, at 31 (Declaration of Kevin M. Jans); ECF No. 541, at 37, 40 (Expert Report of Mary Karen Wills).) The Court has elsewhere excluded the expert testimony as improper legal opinion. (ECF No. 620). Moreover, the Court deems it unnecessary to refer to any witness interpretation of the contract as a matter of law, and in light of the clear lack of ambiguity in the text.

## A. No regulations require SourceAmerica to select the "Best Qualified" NPA

According to SourceAmerica, Bona Fide cannot demonstrate a breach of the Settlement Agreement unless it can show that it was the "best qualified" NPA for each of the 11 Opportunities at issue in this motion for summary judgment.

SourceAmerica's position is bottomed on two problematic assumptions. First, it argues that the federal regulations require it to select only the best qualified NPA for any given Opportunity notice. Second, it argues if it complies with federal regulations and policies, it is then necessarily in compliance with the Settlement Agreement. As a result of these incorrect assumptions, SourceAmerica concludes that there is no breach unless Bona Fide can establish that it had been the best qualified NPA for all of the 11 Opportunities in dispute, and that SourceAmerica had chosen another, less qualified NPA instead.

The first premise in SourceAmerica's contentions as to breach is flawed. SourceAmerica insists that AbilityOne Commission Policy and the FAR constrain it to recommend the "best qualified" NPA to the AbilityOne Commission for any particular opportunity. (ECF No. 527-1, at 13.) In support, SourceAmerica proffers FAR 1.102(b)(ii), which it claims "requires SourceAmerica to recommend for AbilityOne Opportunities only NPAs with 'a track record of successful past performance or who demonstrate a current superior ability to perform,'" and AbilityOne Policy 51.301, which it claims "requires that SourceAmerica recommend only NPAs that can meet the customers' technical and delivery requirements." (*Id.* at 13, 14.)

The Court, however, reads those regulations differently. It concludes that neither of the cited provisions impose a legal obligation on SourceAmerica to choose only the "best qualified" NPA.

FAR 1.102(b) does not set out any binding obligations on SourceAmerica. As evident from its title, FAR 1.102 sets out but a "statement of *guiding principles* for the Federal Acquisition System." 48 CFR 1.102 (emphasis added). The Federal Court of

Claims has recognized as much: because the "text . . . imposes no specific substantive obligations on the Government," it is "therefore . . . not judicially enforceable." *Information Sciences Corp. v. United* States, 85 Fed. Cl. 195, 202 (2008); *accord Am. Tel. & Telegraph Co. v. United States*, 307 F.3d 1374, 1380 (Fed. Cir. 2002). Indeed, when viewed in a fuller context, it is clear that FAR 1.102 subsection (b) sets out an aspiration, not a requirement. There, the FAR promises that the Federal Acquisition System will "satisfy the [federal] customer in terms of cost, quality, and timeliness of the delivered product or service by, *for example*, . . . [u]sing contractors who have a track record of successful past performance or who demonstrate a current superior ability to perform." 48 CFR 1.102(b)(ii) (emphasis added). Moreover, the phrase "current superior ability to perform," does not necessarily indicate that SourceAmerica should always choose the "most qualified" NPA, since a different part of that subsection also provides that Federal Acquisition System will strive to "promot[e] competition." 48 CFR 1.102(b)(iii). The Court espies no sign of a binding legal obligation to choose the "best qualified" NPA stemming from the FAR.

Nor does AbilityOne Commission Policy 51.301 help SourceAmerica's cause. The language seized upon by SourceAmerica requires only that it "shall assign projects and allocations to NPAs that meet the customers' technical and delivery requirements." AbilityOne Policy 51.301(6)(b)(i). That language does not compel SourceAmerica to choose the best qualified NPA, but only requires it to choose an NPA that can meet the requirements set forth by the federal customer. Indeed, an ensuing provision clarifies that once the condition in section 51.301(6)(b)(i) is satisfied, SourceAmerica must consider, *inter alia*, whether "special considerations are warranted" in making a decision. *Id.* at 51.301(6)(b)(iii)(b)(5).

Thus, the Court is not persuaded as a matter of law that SourceAmerica was under a legal obligation to choose only the "best qualified" NPA. The regulatory provisions offered by SourceAmerica indicate, on the contrary, that it has considerable discretion to

3:14-cv-00751-GPC-AGS

recommend NPAs that were technically not the "best qualified."[5]

## B. Bona Fide has designated facts indicating a genuine issue as to breach

Since SourceAmerica is not legally bound to select the "best qualified" NPA, it cannot argue that Bona Fide must demonstrate that it was the best qualified NPA to prove breach. The only pertinent inquiry for breach is whether a reasonable jury could view SourceAmerica's actions as violating its contractual obligation to use best efforts to be fair, objective, and equitable to Bona Fide in the assignment of AbilityOne projects and its provision of equal services.

Bona Fide has set forth substantial evidence—both through the testimony of Jean Robinson, and the proffered testimony of its expert, Kevin M. Jans—which calls the fairness of SourceAmerica's Opportunity assignments vis-à-vis Bona Fide into question. (ECF No. 558-1, at 20–23.)[6]

---

[5]  SourceAmerica has also argued that Bona Fide's CEO, Mr. Lopez had conceded in deposition that SourceAmerica was under a legal obligation to choose only the "best qualified" NPA. The Court does not find that Bona Fide is bound to legal opinions offered by Mr. Lopez as its Rule 30(b)(6) witness, because as Bona Fide notes, a "Rule 30(b)(6) deponent's own interpretation of the facts or legal conclusions do not bind the entity." *Snapp v. United Transp. Union*, 889 F.3d 1088, 1104 (9th Cir. 2018).

[6]  Bona Fide has also submitted a request for judicial notice of a number of documents bearing on its arguments for breach. (ECF No. 557-5.) It asks the Court to take judicial notice of various parts of five documents (1) U.S. Department of Defense, Defense Security Service, National Industrial Security Program Operating Manual (May 18, 2016) (the "DOD Manual"); (2) United States Department of Defense, Defense Security Service, Industrial Letter 2006-02 (Aug. 22, 2006) ("Industrial Security Letter); (3) 41 CFR 51-2.4; (4) National Institute for the Severely Handicapped's 2004 Annual Report; and (5) SourceAmerica's 2014 Annual Report.

A court must take judicial notice if a party requests it and supplies the court with the requisite information. FED. R. EVID. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Id.* This Court may take judicial notice of documents that are public records and capable of accurate and ready confirmation by sources that cannot reasonably be questioned. *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

Despite the objections of SourceAmerica (ECF No. 579-4), the Court finds all documents sought to be judicially noticed by Bona Fide pass muster under Rule 201(d). SourceAmerica is incorrect that Bona Fide's documents are inappropriate for judicial notice because they are presented for the truths set

3:14-cv-00751-GPC-AGS

i.  **Ms. Robinson's Deposition Testimony**

For one, Ms. Robinson, the individual charged by SourceAmerica to fulfill the monitoring duties promised in the Settlement Agreement, testified that during the course of her monitorship, she became aware of facts suggesting that SourceAmerica was not being fair or equitable with respect to Bona Fide. (ECF No. 558-13, at 12–25.) Ms. Robinson testified that she found instances of "irregularities and occurrences and events that occurred during . . . the competitions for contract allocation" at issue. (*Id.* at 20.)

For example, Bona Fide had made an allegation that SourceAmerica was inserting unnecessary certification requirements into Opportunity requirements which were not being requested from the federal customer. After investigating, Ms. Robinson "found at least in the one instance where the allegation was made that the government did not confirm that they wanted that particular requirement as part of the competitive process." (*Id.* at 14.) Furthermore, Ms. Robinson also indicated that SourceAmerica's CEO, COO, and members of its Board asked her to misrepresent facts she had learned about the NPA recommendation process to Bona Fide. (*Id.* at 17–19.) When she refused, she was terminated by SourceAmerica as a result of her "unwillingness to assist her client in defrauding the government in depriving persons with significant disabilities from the full employment they would have enjoyed absent SourceAmerica's troubling practices." (*Id.*)

Ms. Robinson's testimony, standing alone, presents a genuine dispute as to breach.

ii.  **Mr. Jans's Expert Analysis**

---

forth within. The restriction cited by SourceAmerica (*id.*, at 3) appears to apply only to "documents filed in other courts," *Karmer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and not to government publications or statements released by a party in litigation. Indeed, the Ninth Circuit has indicated that it is "appropriate to take judicial notice of [information similar to items 1-3] as it was made publicly available by government entities." *United States Small Business Admin. V. Bensal*, 853 F.3d 992, 1003 n.3 (9th Cir. 2017) (quoting *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)). With respect to SourceAmerica's attempt to exclude items 4-5, Bona Fide is convincing that SourceAmerica cannot fairly question the information it itself has released in connection with its tax returns.

Bona Fide's request for judicial notice (ECF No. 557-5) is granted.

3:14-cv-00751-GPC-AGS

Mr. Jans's expert report also precludes summary judgment on breach. Mr. Jans analyzed the decisions made by SourceAmerica in its NPA recommendation process from a holistic perspective. He segregated SourceAmerica's influence over the NPA recommendation process into four stages, termed the Acquisition Time Zones, and identified actions taken by SourceAmerica at each of these junctures, which, in his opinion constituted unfair and inequitable behavior.

In the first two zones, i.e., the Requirements and Market Research Zones, the procuring agency decides what services it needs and what requirements it would demand of the NPA eventually chosen to provide the service. Mr. Jans explains that SourceAmerica wields significant influence in these initial zones, because it can define and structure the procuring agency's need and then transcribe those needs into mandatory requirements in Opportunity Notices. Mr. Jans believes that SourceAmerica has exerted its influence in favor of favored, larger NPAs to the detriment of smaller NPAs like Bona Fide.

For example, Mr. Jans notes that in several instances, SourceAmerica could theoretically have bifurcated contracts into smaller segments, but elected to design an umbrella Opportunity which bundled the client's requests for separate services. In particular, with respect to Opportunity No. 2693, Mr. Jans contends that ████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ With respect to Opportunity No. 1692, Mr. Jans notes that the Opportunity for the Federal Building at Lakewood, Colorado, was structured to ████████████████████████████████████████ ████████████████████████████████████████ A similar situation played out with respect to Opportunity No. 2705. (*Id.* at 67–68.)

Consistent with Ms. Robinson's testimony, Mr. Jans further observes that SourceAmerica inserted special certifications into its Opportunity Notices, even though

3:14-cv-00751-GPC-AGS

the federal government client did not require such certifications. For example, with respect to Opportunity No. 1483, SourceAmerica apparently instituted a mandatory requirement for Cleaning Industry Management Standard for Green Buildings ("CIMS-GB") certification, a requirement which was not client-driven. (*Id.* at 48.) Similar requirements for CIMS-GB certification not requested by the federal customer were implemented in Opportunity No. 1944. (ECF No. 558-1, at 36.) On other occasions, SourceAmerica would require NPAs to demonstrate current certification, when the applicable regulations require only that the chosen NPA obtain such certification at some point prior to project start.[7] For example, with respect to Opportunity No. 2075, SourceAmerica made it a mandatory requirement that NPAs have Top Secret / Sensitive Compartmented Information ("TS/SCI") security clearance at the time of proposal, as opposed to by the date of performance. (ECF No. 558-1, at 39.)

According to Mr. Jans, SourceAmerica's problematic treatment of Bona Fide was not limited to zones 1 and 2. SourceAmerica also stands accused of misbehaving in zones 3 (where it solicits proposals and responses to its Opportunity Notices) and 4, (where it ultimately selects an NPA based off of its meeting stated criteria and the adequacy of their stated work plan).

In some instances, SourceAmerica would change evaluative criteria after the Opportunity Notice was released, and after proposals were evaluated. This was the case in Opportunity Notice 1944. (ECF No. 535-10, at 54–55.) ███████████████

---

[7] 41 CFR 51-2.4(a)(3) ("The nonprofit agency (or agencies) desiring to furnish a commodity or service under the JWOD Program must satisfy the Committee as to the extent of the labor operations to be performed and that it will have the capability to meet Government quality standards and delivery schedules *by the time it assumes responsibility for supplying the Government*." (emphasis added)).

██████████████████████████████████

██████████████████████████████████

Similar post-hoc changes in evaluative criteria are also presented with respect to Opportunity Notice 2161.  (*Id.* at 59–60.)

Conflicts of interest also asserted themselves in problematic ways in throughout all four acquisition time zones.  According to Mr. Jans's analysis, many aspects of SourceAmerica's evaluative process were potentially tainted by improper connections between key decision-making personnel and those NPAs who eventually were awarded contracts sought by Bona Fide.  (ECF No. 535-10, at 42–46.) These conflicts meant that certain NPAs who enjoyed relationships with SourceAmerica decision-makers would gain an unfair advantage when they submitted Opportunity responses.  The conflicts described by Mr. Jans permeate the evaluative process for Opportunity Notices 1690/1741 (*id.* at 50–54) and 2381 (*id.* at 61–64).

### C. Conclusion on Breach

In light of Bona Fide's summary judgment evidence, the Court agrees that a genuine issue of material fact exists as to whether SourceAmerica's actions in designing, evaluating, and assigning Opportunity Notices breached its obligations to treat Bona Fide fairly, objectively, and equitably.  A reasonable jury could find—based on the facts[8] adduced by Bona Fide with respect to conflicts of interest and SourceAmerica's discretionary control over Opportunity design and the institution of mandatory certification requirements—that there are ways in which SourceAmerica exercised its role as a CNA in ways that were unfair, unobjective, and unequitable to Bona Fide.  The Court denies summary judgment as to breach.

---

[8] The Court is aware that SourceAmerica, and its expert witness, Ms. Wills, hotly contest these facts.  They point to a number of countervailing facts tending to show, *inter alia*, that it was the federal customer's requests that motivated SourceAmerica's structuring decisions, and that SourceAmerica followed all the applicable regulatory requirements.  However, the existence of contrary facts only goes to confirm the Court's holding that there are genuine disputes of material fact precluding summary judgment as to breach.

3:14-cv-00751-GPC-AGS

# V.    Causation

SourceAmerica's final argument on summary judgment is that there is no evidence to support Bona Fide's claim of causation.

## A. Requirement of Proximate Cause

Recall that under Virginia law, a breach of contract claim requires the plaintiff to demonstrate that its injuries were proximately caused by the defendant's wrongful conduct. *Hop-In,* 247 Va. at 190. Virginia defines a proximate act as "that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Rich v. Commonwealth*, 292 Va. 791, 800 (2016).

Where, as here, the plaintiff's alleged damages involve the loss of future contracts, the proximate "causal connection" between its injuries and the opposing party's breach must be proven with "reasonable certainty." *Saks Fifth Ave*, 272 Va. at 188. "Before a question of fact with regard to proximate cause may be submitted to a jury, the evidence proving the causal connection must be 'sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference.'" *Atrium Unit Owners Ass'n v. King*, 266 Va. 288, 294 (2003) (quoting *Beale v. Jones*, 210 Va. 519, 522 (1970)). At base, "prospective profits are not recoverable . . . ," or subject to jury determination "if it is uncertain that there would have been any profits . . . ." *Saks Fifth Ave*, 272 Va. at 188–89; *accord Shepherd v. Davis*, 265 Va. 108, 125 (2003) ("[D]amages based on uncertainties, contingencies, or speculation cannot be recovered.").

At the same time, proximate cause does not demand "such certainty as to exclude every other possible conclusion." *Wooldridge v. Echelon Serv. Co.*, 243 Va. 458, 461 (1992) (quotations and internal citation marks omitted). Moreover, once the initial evidentiary hurdle—which detains any speculative or unsubstantiated allegations of proximate cause—is met, there is no prohibition against establishing "reasonable certainty" by circumstantial evidence. *Id.* Indeed, "facts may be established by circumstantial evidence, such evidence 'must be sufficient to establish the result alleged

is a probability rather than a mere possibility.'" *Atrium,* 266 Va. 288 (quoting *Southern States Coop., Inc. v. Doggett*, 233 Va. 650, 657 (1982)). Pursuant to these governing principles, Bona Fide acknowledges that it must show that it was reasonably certain that it would have won each of the 11 disputed Opportunities had there not been a breach by SourceAmerica.

### B. The Parties' Briefing as to Causation

Initially, Bona Fide advanced its proximate cause arguments only in the most perfunctory and cursory of ways. Though Bona Fide filed a 44-page Opposition brief, only two paragraphs in Bona Fide's therein were addressed to the issue of causation. And in those two paragraphs, Bona Fide blithely refers the Court to the expert reports of Mr. Jans, with the following explanation: Mr. "Jans' 'but for' causation opinion analyzes the likelihood Bona Fide would have been awarded the opportunities at issue . . . . and concludes that ████████████████████████████████████████████████████████████████████████████████████████████████████████████ (ECF No. 555, at 43–44.)

Unfortunately for Bona Fide, the Court has excluded the portions of Mr. Jans's report upon which Bona Fide exclusively relied. (*See* ECF No. 620.) As explained more fully in ECF No. 620, there was "simply too great an analytical gap between the data and the opinion proffered," resulting in a situation where nothing connected Mr. Jans's conclusion to his analysis except his ipse dixit. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not admit an expert opinion that is connected to the underlying data "only by the ipse dixit of the expert"). Specifically, Mr. Jans's report was aimed exclusively at breach—i.e., what did SourceAmerica do that was unfair to Bona Fide?—but did nothing to establish causation—i.e., if Bona Fide were evaluated only according

to fair or uncompromised criteria, was it reasonably certain that Bona Fide could have satisfied all of the requirements, such that it should have been the recommended NPA?[9]

On the hearing held November 16, 2019, the Court addressed the dearth of causation analysis put forth by Bona Fide. There, the Court observed that, despite having cited the applicable Virginia law laying the burden of proving proximate cause on its shoulders, *see Saks Fifth Ave.*, 272 Va. at 188, Bona Fide did not endeavor to set forth in argumentation any data—exclusive of Mr. Jans's expert report—in support of causation. The Court inquired of Bona Fide whether it could point to any record evidence tending to show that it was reasonably certain that it could have won all 11 or one of the 11 disputed opportunities but for SourceAmerica's breach. (ECF No. 603, at 8 (Hr'g Tr., dated November 16, 2018).) The Court registered its concern that Bona Fide's Opposition papers lacked any indication that Bona Fide would have been able to fulfill any of the disputed Opportunity Notice requirements, even if unfair elements were to be removed. (ECF No. 603, at 9.) In response, Bona Fide asserted that there was evidence in the record that would establish that it would have been reasonably certain to win the disputed Opportunities but for SourceAmerica's breach.

After oral arguments, the Court permitted both parties to submit additional briefing as to proximate cause. Bona Fide's supplemental briefing addresses a number of the logical and argumentation-based flaws which inhered in its original papers. (ECF No. 604.) The supplemental briefing sets out, in a more particularized fashion, Bona Fide's contentions with respect to each disputed Opportunity. SourceAmerica's briefing disputes the sufficiency of Bona Fide's supplemental briefing. (ECF No. 607.) SourceAmerica argues, *inter alia*, that Bona Fide has failed to address a number of

---

[9] In addition, it has been made clear through Bona Fide's Opposition brief that Mr. Jans's conclusion as to causation rested on an improper legal premise—that SourceAmerica breaches the Settlement Agreement when it does not "give Bona Fide advantages in the process." (ECF No. 555, at 44.) As discussed *supra* in Section III(D), there is nothing in the language of the Settlement Agreement that obligates SourceAmerica to treat Bona Fide differently than any other NPA. Indeed, to construe the Settlement Agreement to require preferential treatment would render it unenforceable.

superseding and intervening events that vitiated the causal relationship between any breaching action and resulting harm, and that Bona Fide mischaracterized the record evidence in its bid to prove causation.

### C. Analysis

As the Court advised the parties at the hearing, the question for proximate cause is whether Bona Fide has adduced sufficient evidence to demonstrate that it was reasonably certain to have prevailed on the disputed Opportunities but for SourceAmerica's alleged breach.

Bona Fide insists that the present analysis should be guided by the decision of the Virginia Supreme Court in *Banks v. Mario Industries of Virginia, Inc.*, 274 Va. 438 (2007). In that case, Mario Industries, a lighting manufacturer, sued its former employee, Cook, and Cook's newly-erected rival business, Renaissance Contract Lighting & Furnishings for, among other things, tortious interference with business relations. *Id.* at 442–47. The trial court awarded Mario damages with respect to two lighting contracts (with Hilton Garden Inn and Benjamin West), which Mario alleged it lost as a result of Cook's erroneous submission of "bogus" and unreasonably-high project estimates. *Id.* at 458. On appeal, the defendants protested that "plaintiff's damages evidence was speculative, contingent, uncertain, failed to show the claimed damages with any reasonable certainty, failed to show that the defendants' acts or omissions were the direct and cause of the claimed damages." *Id.* at 454.

The Virginia Supreme Court affirmed the awards over defendants' objections. With respect to the Hilton Garden Inn, the court noted that Mario had an ongoing exclusive contract to provide guest-room lighting. It further observed that Mario's president testified that Cook had submitted an improper quote that was 10% higher than what should have been quoted, the amount of which "meant the difference between getting a job and losing a job." *Id.* at 457. Thus, despite Mario's inability to establish the amount of the winning bid, the foregoing evidence was sufficient to sustain a finding that "Mario would have won the Hilton Garden Inn project based on Mario's long-term

relationship with Hilton and Mario's contract as 'the exclusive guest room lighting manufacturer.'" *Id.* Similarly, the Court found significant Mario's "prior working relationship with Benjamin West," and affirmed the district court's proximate cause determination on this basis. *Id.*

SourceAmerica, on the other hand, directs the Court to cases like *Gemalto Pte Ltd. v. Telecomms. Indus. Ass'n.*, No. 1:08CV776 LMB/TRJ, 2009 WL 464484, at *1 (E.D. Va. Feb. 24, 2009) and *Saks Fifth Avenue*, 272 Va. at 177.

In *Saks Fifth Avenue*, the Virginia Supreme Court found that the plaintiff, a high-end men's clothing retailer, had not established the requisite causal link between its former employer's breach of a non-compete agreement and its asserted lost profits. In that case, the retailer's expert did not adequately tie the retailer's lost profits to any breaching conduct. To wit: the expert's damages model ascertained the amount of losses the retailer sustained as a result of the employee's departure, but because the employee was an at-will employee who was legally permitted leave his employment at any time, any losses so incurred could not be directly and proximately traceable to any *wrongful* conduct. *Id.* at 189–190. To prevail, the retailer should have instead proffered analysis specifically connecting the losses to prohibited conduct, such as misappropriation of the retailer's proprietary client information. *Id.*

In *Gemalto*, the plaintiffs, telecommunication companies both, alleged that the defendant's failure to provide user identification codes—R_UIM cards—deprived them of millions of dollars in potential sales to five customers. The court granted summary judgment for defendant on the lack of causation evidence as to plaintiffs' lost profits, finding dispositive the lack of evidence in the record that "either of the two plaintiffs sold R_UIM cards directly to four of the five customers at issue . . . in the past." *Gemalto*, 2009 WL 464484, at *4. As to the remaining potential customer, the Court remarked that "evidence of past sales to the other customer . . . is weak at best." *Id.* Without more, plaintiffs' lost profits failed for want of causation. *Id.* ("[P]laintiffs' evidence that [they]

would have made the sales that they claim lost profits from is speculative and based on contingencies.").

The authorities cited by the parties provide useful guideposts for the Court's discussion on proximate cause. While none of those cases involved the lost profits arising from the alleged unfair allocation of government contract opportunities, they do provide guidance for the kind of proximate cause analysis that a plaintiff must set forth to prevail in Virginia. Applying those principles to the 11 disputed Opportunities at hand, the Court concludes that summary judgment should be granted as to Opportunities Nos. 2075, 1692, 1944, 2161, 2379, and 2318. Summary judgment is denied as to Opportunities 1483, 1741, 2693, 2705, and 2783.

### 1. Opportunity No. 1483

Opportunity No. 1483 was a child care center cleaning services contract for two buildings in Fort Hood, Texas, with an average annual value of ▮▮▮▮▮▮▮▮. Eight NPAs submitted proposals for SSN 1483, and CW Resources, Inc. ("CWR") was ultimately granted the contract.

Bona Fide argues that SourceAmerica unfairly and unlawfully made the current possession of a CIMS-GB certification a mandatory requirement, which had the effect of eliminating Bona Fide's proposal (Bona Fide's proposal indicated that its application for CIMS-GB certification was 65% complete). (ECF No. 604, at 14–15.) Bona Fide also contends it was improper that SourceAmerica disqualified Bona Fide on the basis of an incomplete IRS Form 990 when other NPAs were not penalized for failing to attach various other financial documentation, and where Bona Fide asked for an opportunity to provide the missing pages. (*Id.*) Bona Fide argues that if those two unfair evaluative criteria were removed, its proposal would have been as, if not more, competitive as that submitted by CWR, the contract winner. (*Id.* at 17.)

As an initial matter, the Court finds no evidence that Bona Fide was penalized for the incompleteness of its IRS Form 990. On the contrary, the record evidence indicates that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3:14-cv-00751-GPC-AGS

However, the Court agrees with Bona Fide that there is evidence upon which a reasonable jury could conclude that SourceAmerica departed from the SSN's stated evaluation criteria when it based its recommendation on whether the NPA had a current CIMS-GB certification. Although there is nothing inherently wrong with having a *preference* for an NPA with current CIMS-GB certification, Ms. Robinson's testimony that SourceAmerica would often experience "irregularities" when it comes to imposing heightened certification requirements (ECF No. 558-13 (Depo. of Jean Robinson, dated April 12, 2018)), and especially as they relate to Bona Fide, permits the inference that SourceAmerica's insistence on a current CIMS-GB certification was borne out of a desire to disadvantage Bona Fide.

Thus, the Court turns to whether Bona Fide can show that, but for the CIMS-GB certification requirement, it would have been reasonably likely to prevail. Bona Fide argues that a reasonable jury could conclude, based on a side by side comparison of its proposal and CWR's winning proposal, that Bona Fide had the superior bona fides. (ECF No. 604, at 15.) The Court agrees that the relative merits of Bona Fide and CWR's proposals is a matter that should be presented to a jury. That being the case, the Court finds that Bona Fide has adduced non-speculative evidence of proximate cause. Summary judgment as to SSN 1483 is accordingly denied.

**2. Opportunity No. 1692**

Opportunity No. 1692 was a grounds maintenance and snow and ice removal contract in the Denver, Colorado area with an estimated annual value of $1.6 million. SourceAmerica had recommended a different NPA for the Opportunity before the Opportunity was cancelled by the AbilityOne Commission. Bona Fide alleges that SourceAmerica met and exceeded all criteria for this Opportunity (and should have been recommended), but that SourceAmerica unfairly penalized it for failing to submit a complete IRS 990 form, an omission that SourceAmerica had previously excused for other NPAs who pursued other Opportunities. SourceAmerica disputes that the disqualification based on the incomplete IRS 990 form was un-uniformly applied, and faults Bona Fide for not submitting into evidence its response to the Opportunity Notice.

Regardless of whether SourceAmerica unfairly held Bona Fide to a higher standard—i.e., to the requirement of a completed IRS 990 form—Bona Fide fails to establish the requisite causation with respect to Opportunity No. 1692. Most strikingly, Bona Fide does not dispute that the AbilityOne Commission decided to revoke this opportunity after declaring a severe impact on the incumbent contractor originally servicing the Denver facility. The Court agrees with SourceAmerica that the AbilityOne Commission's independent, and intervening decision to pull Opportunity No. 1692 vitiates any claim by Bona Fide that it was *SourceAmerica's* inequitable selection with respect to, and design of, Opportunity No. 1692, that proximately caused Bona Fide to lose out on the contract. Summary Judgment is granted with respect to Opportunity No. 1692.

### 3. Opportunity No. 1690/1741[10]

SSN 1741 sought an NPA to provide enterprise-wide IT services for the Department of Defense, and was valued at approximately $60-70 million. SSN 1741 garnered three proposals, from Lakeview Center Inc. ("Lakeview"), who subcontracted with InspiriTec, Linden Resources, Inc., and PORTCO, Inc. ("PORTCO"), who

---

[10]     SSN 1690 was published on September 21, 2012, cancelled on October 12, 2012, and reissued as SSN 1741 on October 17, 2012.

subcontracted with Bona Fide.  Lakeview was awarded the opportunity after one of the four SourceAmerica evaluators changed his initial vote from PORTCO to Lakeview after a phone call with the rest of the team.  (ECF No. 558-15, at 26-27 (Sealed).)

Bona Fide contends that Lakeview should have been barred from consideration because (1) it failed to meet a mandatory minimum requirement—that is, a "no-go" condition, and (2) two of the four SourceAmerica evaluators for SSN 1741, i.e., Peggy Gritt and Daniel Woods, had ulterior motives—borne out of quid pro quo conflicts of interest—for recommending Lakeview.  (ECF No. 604, at 13.)

The bulk of Bona Fide's allegations pertain to Mr. Woods. ███████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████████ Bona Fide identifies two conflicts with respect to Mr. Woods. ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████ Bona Fide suggests that the evidence arguably demonstrates Mr. Woods maintained contact with Mr. Kessler during the development of SSN 1741, and that Mr. Woods had designed the opportunity with Lakeview in mind.  For this, Bona Fide cites to ███████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████

Second, Bona Fide alleges that whatever fledgling conflict of interest Mr. Woods might have had owing to his acquaintanceship with Mr. Kessler deepened into an actual conflict of interest when Mr. Woods took a job with Lakeview after he had voted to recommend Lakeview, and while the source-selection process was pending.  Lakeview's September 27, 2102 proposal for SSN 1741 advised that it would be hiring a new "Senior



1   Operations Executive" to oversee the project, if Lakeview were selected.  Mr. Woods

13          Ms. Gritt, another evaluator on SSN 1741, and Mr. Woods's supervisor, also left

14  SourceAmerica after recommending Lakeview for the opportunity.

18          In addition to these potential conflicts of interest, Bona Fide also points out that

19  Lakeview should not have been considered for SSN 1741 because it likely did not meet

20  one of the mandatory, go/no-go conditions for the opportunity.  A "minimum criteria" for

21  SSN 1741 specified that "[i]f a[n NPA's] AbilityOne Contract has been removed, it will

22  not be eligible for new opportunities until one year has elapsed and the [NPA] can

23  demonstrate renewed capacity."  (ECF No. 558-15, at 90 (Sealed).)  After Lakeview was

24  recommended for SSN 1741, PORTCO advised SourceAmerica, on December 28, 2012,

25  that

A reasonable jury could find, on the basis of the foregoing, that SourceAmerica breached its obligations to be fair, equitable, and objective, and that Lakeview should not have been awarded SSN 1741. Furthermore, because the proposal from PORTCO (which included Bona Fide as a subcontractor) was the only proposal other than Lakeview's to have garnered any votes, it was reasonably certain that, but for SourceAmerica's conflicted source-selection process, PORTCO would have been selected for the opportunity.

Although SourceAmerica resists this conclusion on a couple of grounds, none of them are availing. First, SourceAmerica argues that Bona Fide did not follow procedures in the Settlement Agreement to alert SourceAmerica of its participation in PORTCO's proposal. But, Mr. Lopez's testimony provides that he had, ███████████████ ███████████████████████████████████████████████████████████████ ████████████████████████████████████████ Second, SourceAmerica argues that Bona Fide was not qualified for the opportunity because it admitted that it had no previous IT experience. However, Bona Fide points out that at the time of PORTCO's submission, ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ And, the fact that Bona Fide was seeking to expand into a new area of business did not preclude at least one SourceAmerica evaluator from initially recommending the PORTCO/Bona Fide team over Lakeview. Third and finally, the Court does not find persuasive SourceAmerica's objection that it would be speculative to believe that a non-conflicted team of evaluators would have voted for the PORTCO/Bona Fide team. Of the two non-conflicted evaluators, one had voted for PORTCO before being persuaded to vote for Lakeview. If Lakeview were not eligible for the recommendation, then it is reasonably certain that PORTCO, as the runner-up in the source-selection process, would have been selected. Summary judgment is denied as to SSN 1741.

**4. Opportunity No. 1944**

SSN 1944 was a custodial services contract for the Coast Guard's Headquarters in Washington D.C., administered by the General Services Administration ("GSA"), with an annual value of $3.5 million.

Bona Fide alleges that SourceAmerica breached the Settlement Agreement by unilaterally implementing ████████████████████ without GSA approval and selecting four NPAs to make presentations to GSA, instead of permitting only three NPAs to make presentations, as was specified in the SSN. (ECF No. 604, at 16.) Further, Bona Fide points out that SourceAmerica's ███████████ ████████ requirements were unevenly applied against it, since The Chimes, an NPA that was selected to present to GSA, also did not have either credential.

The Court, however, is not convinced that Bona Fide has shown that it would have obtained the contract, had the allegedly-problematic requirements been removed. On this point, the Court agrees with SourceAmerica that Bona Fide has failed to show how any of the alleged breaches resulted in its loss of SSN No. 1944. First, the selection of four NPA presenters instead of three cannot evince unfairness, inequality, or unobjectivenes; if anything, increasing the pool of NPAs to present to GSA can only operate to Bona Fide's benefit.

Second, it is true that there is a genuine dispute as to who—either GSA, as the client, or SourceAmerica, on its own accord—████████████████████ ███████████. But regardless of their provenance, Bona Fide has not demonstrated that it was the insertion of these requirements that doomed its proposal. Bona Fide relies on a contorted argument that, because only its and CWR's proposals are in evidence, and because CWR should be disqualified, "only Bona Fide's bid is eligible for an award." (ECF No. 604, at 17.) As with a similar assertion made with respect to Opportunity No. 2161, *infra*, the Court must reject this argument as wholly illogical. The only rationale Bona Fide offers for disqualifying CWR is the fact that SourceAmerica expanded the number of presenters from three, to four. But because the Court declines to find that action inequitable, there is no reason to discount CWR's proposal in the instant counter-

factual analysis.  Moreover, the fact that the other NPAs's proposals are not in evidence is no reason to discount the possibility that they might have succeeded.  Indeed, Bona Fide cannot simply paper over an evidentiary lacuna for which it bears the burden of production by stating carte blanche that it was told by SourceAmerica that it had submitted "an excellent plan."  (ECF No. 604, at 17.)  As Bona Fide was instructed at the November 16, 2018 hearing, it must prove the requisite proximate causal relationship by demonstrating that it was reasonably certain to prevail on any given opportunity.  Without demonstrating that it had a superior submission vis-à-vis any of the other NPAs (minus the contested credentials) the Court cannot conclude that it would have been reasonably certain to prevail.

Based on the foregoing, the Court cannot conclude that there was a direct and proximate relationship between any unfair imposition of ███████████ ███ requirements and Bona Fide's loss of SSN 1944.  Summary judgment as to SSN 1944 is proper.

### 5.  Opportunity No. 2075

Opportunity No. 2075 was a Total Facilities Management ("TFM") Tier 4[11] project valued at approximately ██████████ to be performed for the National Geospatial Intelligence Agency in Missouri.  Bona Fide argues that an incorrigible conflict of interest pervaded the design and drafting of the Opportunity: by Bona Fide's account, SourceAmerica unfairly required NPAs to submit evidence of current TS/SCI clearance and implemented a requirement that any NPAs must subcontract with a Service Disabled

---

[11]      In 2015, SourceAmerica implemented a rubric for grouping and characterizing available opportunities according to a system of tiered classifications known as the TFM Tiers.  (*See, e.g.*, ECF No. 128, at 205.)  AbilityOne projects and NPAs are both subject to Tier classifications.  AbilityOne projects are assigned Tier levels based on the estimated contract value and complexity of the tasks requested, and NPAs are assigned Tiers based on, *inter alia*, their past work history, their geographic reach and facility management presence.  Tier levels range from 1, to 4, with Tier 1 NPAs handling contracts totaling less than $3 million in annual value, and Tier 4 NPAs operating contracts in excess of $10 million dollars annually.
SourceAmerica provides priority and preference to responses from NPAs within the same tier classification as the opportunity.  (*See* ECF No. 535-5, at 88.)

Veteran-Owned Business ("SDVOB") at the behest of Kent, Campa, and Kate ("KCK"). (ECF No. 604, at 28.)  KCK, it is alleged, was both a qualifying SDVOB which benefited from the restrictive requirement, and had representation on SourceAmerica's Board of Directors.  (*Id.*).

Despite Bona Fide's demonstration of a potential conflict of interest, Bona Fide cannot survive summary judgment as to Opportunity No. 2075.  Bona Fide failed to prove that it lost Opportunity No. 2075 directly and proximately as a result of SourceAmerica's actions.  First, and most critically, Bona Fide never submitted a proposal for this Opportunity, making any finding that it might have prevailed thereupon a matter of pure conjecture and speculation.  Although Bona Fide attempts to diminish the significance of this fact by arguing that it was deterred from applying because of SourceAmerica's prohibitive TS/SCI and SDVOB requirements, it has not pointed the Court to any authority indicating that a court may overlook a significant, intervening event—such as the plaintiff's failure to enter a bid in the first place—in evaluating the existence *vel non* of proximate cause.

In any event, it seems beyond peradventure that Bona Fide, as a Tier 1 NPA, would have been woefully underqualified for the Opportunity.  As explained *supra* in footnote 11, Tier 4 projects, like Opportunity No. 2075, typically involve complex, high-value operations.  It is undisputed that the largest contract Bona Fide has handled has an annual value of less than $500,000.  To the extent that Bona Fide has suggested that it *might have* sought to partner with a larger NPA, ████████ for this Opportunity, no such joint proposal was ever submitted for consideration by SourceAmerica, and the hypothetical competitiveness of any such partnership cannot long detain the Court.  *See Gemalto*, 2009 WL 464484, at *4 (declining to credit evidence of lost profits based on speculation and contingencies).  Summary judgment is granted with respect to Opportunity No. 2075.

### 6.  Opportunity No. 2161

3:14-cv-00751-GPC-AGS

SSN 2161 was a custodial services contract in Puerto Rico with an estimated annual value of ████████ Bona Fide alleges that the source-selection process for SSN 2161 was plagued with an intractable conflict of interest. According to Bona Fide, SourceAmerica and the winning NPA, TCS, had a pre-existing understanding that TCS would be awarded SSN 2161. (ECF No. 604, at 25.)

The Court agrees that there are some signs of inequity in the way that SourceAmerica designed and allocated SSN 2161. For one, the record evidence indicates that SourceAmerica and TCS █████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████ Joseph Diaz testified ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████ ████████████████████████████████████████████ ███████████████████████████████████

If a jury believes that a conflict of interest permeated the design and allocation of SSN 2161, as it reasonably might in light of the summary judgment evidence, the next question becomes whether absent this conflict of interest, Bona Fide was reasonably certain to prevail over TCS. Bona Fide argues that it would be problematic for this Court to hold it to a set of selection criteria designed with another NPA in mind (ECF No. 604, at 23–24), but does not otherwise provide the Court with any reason to believe that it would have been qualified to perform the requested work in Puerto Rico. Moreover, Bona Fide, citing *Mario Industries*, 274 Va. at 457–58, also argues that the Court need not concern itself about the other three NPAs that submitted responses, since their

---

[12] ████████████████████████████████████████████ ███████████████████████████████████

proposals were not included as part of the record. (ECF No. 604, at 26.) Because the other NPAs's proposals are not in evidence, and because TCS is alleged to be ineligible to compete owing to the conflict of interest, Bona Fide reasons that it, as the only non-conflicted NPA with a proposal in the record, should be given the green light to make its pitch to a jury.

In so arguing, however, Bona Fide both misreads *Mario Industries*, and turns the summary judgment standard on its head. The Virginia Supreme Court's holding in *Mario Industries*—that the party claiming damages for lost profits need not show evidence of the amount of a competitor's winning bid—cannot be imported wholesale into this case. There, it was unnecessary for Mario to demonstrate the differences between its unavailing bid and the ultimately successful one, because, given the long-standing relationship between Mario and the Hilton Garden Inn, and their exclusivity agreement, it was not at all speculative to conclude that but-for Cook's erroneously-high bid, Mario would have continued to be the Hilton Garden Inn's lighting provider of choice. 274 Va. at 457–58. Here, however, there is no similarly-strong indication that Bona Fide would have otherwise acceded to SSN 2161. Moreover, once the moving party, i.e., SourceAmerica, has challenged a necessary element of Bona Fide's claim—i.e., proximate causation—the burden shifts to Bona Fide to produce evidence sufficient to resist summary judgment.

Thus, any failure to produce the other NPAs's proposals, or to assert Bona Fide's ability to meet non-conflicted requirements of SSN 2161, must be laid squarely at its feet. Summary judgment is proper.

### 7. Opportunity No. 2379[13]

---

[13] Bona Fide addressed SSN 2379 in its ex parte motion for leave to file a supplement. (ECF No. 594.) That ex parte motion contained an appendix laying out "a portion of its anticipated argument." (*Id.* at 11.) In response, the Court noted that, given the arguments in Bona Fide's anticipated argument, " at least as was demonstrated with respect to Sources Sought Notice 2379, that there is competent summary judgment evidence, already in the record, which *might* create a genuine issue as to causation," warranting leave to supplement. (ECF No. 600, at 4 (emphasis added).) Bona Fide takes that comment

SSN 2379 was a TFM Tier 1 opportunity for services at Peoria, Illinois, valued at ███████. This contract was ultimately cancelled after the AbilityOne Commission determined that there would be an adverse impact on the incumbent service provider. Bona Fide contends that SourceAmerica breached the Settlement Agreement by (1) erroneously providing branch financial information, instead of parent company information to the AbilityOne Commission for its adverse impact determination, and (2) by failing to petition the AbilityOne Commission to re-visit its adverse impact determination with parent company information once SourceAmerica knew that Bona Fide had submitted a proposal. Bona Fide argues that it would have been awarded SSN 2379 absent an adverse impact determination because it was the only Tier 1 NPA to have submitted a proposal.

SourceAmerica disputes that it "erroneously" provided information to the AbilityOne Commission. It contends that the AbilityOne Commission was permitted to, and in fact exercised its discretion to base its adverse impact determination on the financial impact of the branch, instead of the overall parent company.

The Court agrees with SourceAmerica that the record evidence cited by Bona Fide does not support its claim that SourceAmerica erred in providing only the incumbent branch financial information to the AbilityOne Commission. The deposition testimony relied on by Bona Fide[14] instead indicates that it was up to the AbilityOne Commission whether to consider branch or parent company information (ECF No. 558-25, at 23, 37), and that the deponent recalled that SourceAmerica *had* engaged in efforts to get the Commission to reconsider. (*Id.* at 35, 47.)

Because Bona Fide has no evidence that SourceAmerica breached the Settlement Agreement with respect to SSN 2379, it cannot argue that the breach was proximately

as a firm ruling on whether there was proximate causation; it is not.

[14] Bona Fide incorrectly identified the deponent as Mr. Stream, but it the actual deposition cited contained testimony from Mr. Kevin Schmidt.

related to its loss of the opportunity. In any event, even assuming that Bona Fide proved breachful conduct, Bona Fide has not articulated through argument, or designated supporting evidence in the record that it was, at the minimum, qualified for the opportunity. While Bona Fide seems to gesture at its qualifications by pointing out that its Tier level matched that on the SSN, that fact, standing alone, says nothing about whether its proposal demonstrated a capability to perform the services requested by the SSN. Bona Fide's proof on this SSN is comparable to the evidence considered in *Gemalto*, where "plaintiffs' evidence that the named plaintiffs would have made the sales that they claim lost profits from is speculative and based on contingencies." 2009 WL 464484, at *4. Summary judgment is proper.

### 8. Opportunity No. 2381

Opportunity 2381 was a high-profile custodial services contract for the United States Senate Office Buildings in Washington D.C. with an estimated annual value of $650,000. Five NPAs submitted proposals, and ultimately, Davis Memorial Goodwill Industries ("Davis Memorial") was selected.

Bona Fide argues that Davis Memorial's award of Opportunity No. 2381 came about as a result of a conflict of interest. Bona Fide alleges that Davis Memorial, as one of 161 member organizations under Goodwill International, benefited from Goodwill International's connections with SourceAmerica. At the time of Opportunity No. 2381, Goodwill International was represented on the Board of Directors of SourceAmerica by Catherine Meloy and Jim Gibbons. According to Bona Fide, the presence of Mr. Gibbons and Ms. Meloy on the Board of Directors somehow caused SourceAmerica's "evaluators [to] engage[] in *post-hoc* evaluations of several SSN 2381 factors that favored [Davis Memorial] and unfairly and inequitably disadvantaged Bona Fide." (ECF No. 604, at 22.)

After examining the record pages cited by Bona Fide, the Court agrees with SourceAmerica that there is no evidence that SourceAmerica improperly applied any of the SSN 2381 factors to benefit Davis Memorial. More importantly, Bona Fide never

asserts that it was otherwise qualified to supply the services sought by Opportunity No. 2381. It only argues that it ought to have won the opportunity because the other NPAs are also alleged to have benefited from SourceAmerica's problematic post-hoc evaluations, and must be disqualified on that basis. Because the Court finds no improper application of any of the SSN 2381 factors, it has no reason to discount the possibility that one of the other NPAs could have been awarded the contract. In such a case, it would be too speculative to conclude that Bona Fide was reasonably certain to have won the contract. Summary judgment is proper as to SSN 2381.

### 9. Opportunity No. 2693

SSN 2693 is a custodial and related services contract at the Wright-Patterson AFB with an annual value of $840,000. Its "primary service requirements" include routine custodial services, snow and ice removal, as well as Clean Room cleaning. (ECF No. 558-19, at 17.) Nine NPAs submitted proposals and CWR was ultimately selected.

Bona Fide contends that SourceAmerica recommended CWR "on the basis of *post-hoc* standards" that made "prior clean room experience 'critical and 'required' for an award," when no such prior experience was specified in the SSN. (ECF No. 604, at 18.) According to Bona Fide, despite the absence of any hard and fast requirement of prior experience with clean rooms, SourceAmerica advised Bona Fide during a post-award debrief that the reason it was not selected to provide services at Wright-Patterson AFB was because prior clean room background was "critical." (ECF No. 558-19, at 23.) Bona Fide further posits that it is canonical procurement law that a buying agency "may not solicit proposals on one basis and make award on another basis," *Dubinsky v. United States*, 43 Fed. Cl. 243, 247–48 (1999).

SourceAmerica contests that the SSN adequately disclosed the requirement of past clean room experience. SourceAmerica refers the Court to a passage in the SSN which states:

> T[he primary service requirements] also includes 'Clean Room' cleaning for Buildings 20620 and 20644, which requires the use of specific cleaners that

> are provided by the government.  Clean room gowns shall be worn when
> entering the Clean Rooms.  Refer to Section 1.1.6 of the provided draft PWS
> for specific details regarding Clean Room requirements.

(ECF No. 558-8, at 12.)  It also highlights a later passage in that same document which asks responding NPAs to "ensure [that] any relevant past performance with . . . Clean Room cleaning, is included."  (*Id*.)

The Court finds that Bona Fide has identified a triable issue of fact as to whether SourceAmerica invoked *post-hoc* evaluation standards with respect to SSN 1692. Although aspects of the SSN indicated that past experience would be *relevant*, nothing in that notice commanded that prior experience with clean room cleaning was *mandatory*. Indeed, here Bona Fide is arguing that the indispensability of Clean Room experience was newly-instituted, and that is not contradicted by statements in the SSN which required responding NPAs to enumerate "any relevant past performance with . . . Clean Room cleaning."   Indeed, a reasonable jury could find that SourceAmerica properly discounted Bona Fide because it didn't meet its preference for an NPA with past clean room experience; on the other hand, that same jury could, based on Ms. Robinson's deposition testimony, among other things, also find that SourceAmerica hardened the preference for clean room experience into a firm requirement for less than equitable reasons.

Furthermore, the Court agrees with Bona Fide that there is sufficient evidence that, but for SourceAmerica's improper reliance on undisclosed evaluative standards, Bona Fide would have been reasonably certain to have prevailed as to SSN 1692. SourceAmerica argues that the Court should not so find because only the proposals from Bona Fide and CWR are in evidence, and without a side-by-side comparison of the merits of all the proposals, no such conclusion ought be drawn.  However, Bona Fide convincingly argues that a reasonable jury could compare Bona Fide's and CWR's technical solutions and find Bona Fide's submission to be superior.  (ECF No. 604, at 19.)  That being the case, it is of no moment that the other NPAs' responses are not before the Court: if there is a colorable argument that Bona Fide's submissions were

3:14-cv-00751-GPC-AGS

more, or at least as, meritorious as the one submitted by the winning NPA, it follows that a legitimate inference may be made that Bona Fide's proposal was also superior to those NPAs's who did not make the cut. *Atrium*, 266 Va. at 294. Summary judgment as to SSN 2693 is denied.

### 10. Opportunity No. 2705

Opportunity No. 2705 was a transfer of custodial services contract for Shaw Air Force Base, South Carolina, with an estimated annual value of ███████████ Bona Fide, relying on the opinion of its expert, Mr. Jans, alleges that SourceAmerica breached its Settlement Agreement obligations when it "chose" to combine two existing contracts into a single contract for comprehensive base-wide services, an election which necessarily disadvantaged smaller NPAs like itself. (ECF No. 604, at 26.) Bona Fide also contends that SourceAmerica used a financial sustainability worksheet—which allegedly "did not reflect any customer requirement"—to appraise NPA responses. (ECF No. 604, at 26.) CWR ultimately secured Opportunity No. 2705, whereas Bona Fide was appraised as having an "overall acceptable technical plan," but was not selected owing to ██████████████████████████████████████████████████ ██████████████████████████████████████ By Bona Fide's account, but for these two inequitable and unfair actions, it was reasonably certain to have prevailed.

SourceAmerica, on the other hand, argues that it did not make an election to merge two contracts into Opportunity No. 2705. It points out that Opportunity No. 2705 was a "Transfer Opportunity" for base wide janitorial services, which ████████████ ██████████████████████████████████████ ██████████████████████████████████████ The thrust of this argument is that SourceAmerica was merely passing on a predetermined, pre-packaged Opportunity, and therefore did not "choose" to bundle two smaller contracts together. But, SourceAmerica does not adequately address the heart of Mr. Jans's contention, which is that it was been possible for SourceAmerica to

disentangle the two contracts from each other, even upon transfer. ███████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████

SourceAmerica additionally claims that there was nothing improper about the financial sustainability worksheet, because the only proof Bona Fide cited for the proposition—a deposition exchange with SourceAmerica's Thomas Hawkins—did not evidence any impropriety.   (ECF No. 607, at 27.)  While the Court agrees that Mr. Hawkins's deposition does not contradict SourceAmerica's claim, it does find that other evidence on file shows that SourceAmerica recognized that Bona Fide should have acceded to higher marks with respect to financial sustainability.[15]

Because SourceAmerica's stated reasons for not choosing Bona Fide for Opportunity No. 2705 were ██████████████████████████████████████████ ████████████, and because Bona Fide adequately challenged the fairness of those two factors, the Court will deny summary judgment.  The evaluative documents associated with Opportunity No. 2705 indicate that, but for those two aspects, Bona Fide had an acceptable proposal.  And while the estimated value for the Shaw AFB project is somewhat higher than Opportunities previously undertaken by Bona Fide, the value differential is not so stark, in light of Bona Fide's demonstrated past experience with custodial contracts.  Thus, the Court finds "evidence proving the causal connection . . . 'sufficient to take the question out of the realm of mere conjecture, or speculation, and into the realm of legitimate inference,'" to warrant posing the proximate cause issue to the jury.  *Atrium*, 266 Va. at 294 (quotation marks and citation omitted).

## 11. Opportunity No. 2783

---

[15]    Specifically, the NPA Recommendation Process Team Evaluation Matrix for No. 2705 captured the evaluators' appraisal of Bona Fide as follows: ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

3:14-cv-00751-GPC-AGS

SSN 2783 involved custodial and related services contract for four facilities in Chicago, Illinois, with an estimated annual value of ███████. Bona Fide claims that SourceAmerica breached the Settlement Agreement when it awarded CWR the contract. Specifically, Bona Fide accuses SourceAmerica of disregarding SSN 2783's requirements and instead relying on an undisclosed, ███████████████ ██████████ in making the contract recommendation. (ECF No. 606, at 23 (Sealed).) Bona Fide was told by SourceAmerica's Executive Director, Chris Stream. at debriefing that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ Bona Fide, however, points out that the deficiencies noted by Mr. Stream were all manufactured. For example, Mr. Stream apparently ████████ ████████████████████████████████████████████████ ███████████████████ However, Bona Fide points out that it ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Mr. Stream also evidently faulted Bona Fide ██████████████████████████████████████ ██████████████ (*Id.* at 145.) But, Bona Fide points out that ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████ The mismatch between SourceAmerica's stated reasons for eliminating Bona Fide, and the actual proposal submitted, led Bona Fide to conclude in its appeal letter to the AbilityOne Commission that ██████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████████ ████████ ███████████

The Court concludes on the foregoing that a reasonable jury could find that SourceAmerica breached its obligation to be fair, equitable, and objective to Bona Fide with respect to SSN 2783. Indeed, the internal SourceAmerica evaluation matrix for SSN 2783 indicates that ████████████████████████████████████████ ████████████████████████████ And the section under which SourceAmerica critiqued Bona Fide's ████████████████████████████████ ████████████████████████████████████████████ ████████████████ The discrepancies between Mr. Stream's debrief of Bona Fide's proposal and the evaluation conducted by the SourceAmerica team further inclines the Court to find a triable issue as to breach.

The Court then looks to whether there is a causal nexus between SourceAmerica's breach and the resulting loss of the contract. Bona Fide argues that a jury could find that it was reasonably certain to prevail on SSN 2783, given that Bona Fide had considerable ties in the Chicago, Illinois area, provided customized plans of how it would service the different buildings in SSN 2783, and had proven experience for snow removal for other GSA facilities in Chicago. (ECF No. 604, at 21.) Bona Fide asserts that, by contrast, CWR's winning proposal was less tailored to the project's requirements and contained only generic statements about its various certifications and credentials. (*Id.* at 22.) It further argues that absent the evident bias against Bona Fide, Bona Fide should have been selected. Because both CWR's proposal and Bona Fide's are in evidence, and because there is circumstantial evidence of a causal connection between Bona Fide's loss of SSN 2783 and SourceAmerica's unstated or unfairly-applied evaluative criteria, the Court denies summary judgment.

## VI. Conclusion

For the above reasons, the Court construes the terms of the Settlement Agreement as a matter of law, and in accordance with that interpretation, grants summary judgment with respect to Opportunities 2381, 2379, 2161, 1944, 1692, and 2075. Summary judgment is denied with respect to Opportunities 1483, 1741, 2693, 2705, and 2783.

**IT IS SO ORDERED.**

Dated:  March 26, 2019

Hon. Gonzalo P. Curiel
United States District Judge

3:14-cv-00751-GPC-AGS